**Kenneth Ray THACKER, Plaintiff,**

**v.**

**Douglas R. PEAK, individually and in his official capacity as superintendent of the Water Board of the City of Hurricane, West Virginia; Raymond Peak, Gene Young, E.E. Nichols, Jack H. Gibson and Steve Sovine, individually and as members of the Water Board of the City of Hurricane, West Virginia; and the City of Hurricane, West Virginia, Defendants.**

Civ. A. No. 2:91–0399.

United States District Court,
S.D. West Virginia,
Charleston Division.

June 3, 1992.

Henry C. Bias, Jr., Charleston, W.Va., for plaintiff.

Kevin A. Nelson, Kay, Casto & Chaney, Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the motion of the defendants for summary judgment.

### I. *Background*

Plaintiff Kenneth Ray Thacker was employed by the Water Board of the City of Hurricane, West Virginia, from approximately January 1977 until April 10, 1989. On April 20, 1989, he was discharged by defendant R. Douglas Peak (hereinafter, Doug Peak) when he appeared for work at a time when he was scheduled to be on vacation. Plaintiff's complaint alleges that he was wrongfully terminated because of his political affiliation, in violation of his constitutionally protected First Amendment rights. Additionally, the complaint states that inasmuch as he was discharged without a hearing, the defendants deprived him of protected liberty and property rights without due process and equal protection. The complaint also alleges that plaintiff's discharge was the result of an unlawful conspiracy between the defendants and that prior to his discharge, the defendants unlawfully conspired to force him to leave his employment. In addition, plaintiff asserts that his discharge was a breach of an

express oral contract[1] and an implied contract that he would not be terminated except for cause.

Plaintiff's complaint further states causes of action for defamation. In particular, plaintiff contends that Doug Peak made defamatory statements at a hearing held on plaintiff's application for unemployment benefits. Plaintiff further claims that the defendants made defamatory statements about him to prospective employers and, consequently, he has been unable to find substitute employment.

Defendants contend that they are entitled to summary judgment on plaintiff's allegation that he was discharged because of his political affiliation. In support of their motion, defendants argue that inasmuch as there was a period of ten years between the claimed protected activity and plaintiff's discharge, there is an insufficient nexus between the two to establish a reasonable probability that he was fired because of the activity. Alternatively, defendants argue that even if the plaintiff has made a prima facie case of improper motivation, he has not successfully demonstrated that insubordination, their proffered legitimate reason for terminating him, is pretextual.

Defendants also seek summary judgment on plaintiff's defamation claims. They assert that the statements made in the unemployment compensation hearing are absolutely privileged under West Virginia law and thus are not actionable. In addition, defendants maintain that they are entitled to summary judgment with respect to the defamation claim based on statements to prospective employers. In the view of the defendants, statements of reference by a former employer are subject to a conditional or qualified privilege which protects them from civil liability in the absence of a showing of abuse of the privilege, which is not present in this case.

Finally, defendants maintain that they are entitled to summary judgment on plaintiff's breach of contract claims. Defendants rely primarily on the statute of frauds and on West Virginia's requirement that any alteration of the state's employment at-will presumption must be very definite to be enforceable.

The motion for summary judgment does not address plaintiff's conspiracy allegation or his claim that his discharge without a hearing violated his due process and/or equal protection rights.

## II. *Discussion*

Defendants are entitled to summary judgment upon a showing "that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those necessary under controlling substantive law to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The requirement that there be a "genuine issue" about the facts material to a claim "means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

In reviewing the evidence, the court must not weigh the evidence or resolve disputed facts. *Id.* Similarly, the court may not make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir.1986). Nonetheless, when a motion for summary judgment is properly supported, the opposing party may not rest upon mere allegations or denials in his pleadings. Fed.R.Civ.P. 56(e). Rather, the motion must be opposed by affidavit or otherwise setting forth "specific facts showing there is a genuine issue for trial." *Id.*

If the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmoving party, a genuine issue of fact

---

1. Plaintiff's complaint does not state a cause of action based on breach of an oral contract of continued employment. However, inasmuch as both parties have addressed that theory in the context of the pending motion, the court deems it appropriately submitted.

exists and summary judgment is inappropriate. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. On the other hand, defendants are entitled to summary judgment if plaintiffs have failed to establish an essential element of their causes of action, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), or "where the record as a whole could not lead a rational trier of fact to find for the non-movant," *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

■■■ Where state of mind is a decisive element of a claim or defense, summary judgment is seldom appropriate inasmuch as state of mind generally is dependent on the resolution of conflicting inferences drawn from circumstantial or self-serving evidence, *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979), or on the credibility of witnesses, *Ross,* 759 F.2d at 364 (citing *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir. 1979)). Nonetheless, even when motive is a critical issue, such as in a discriminatory discharge action, summary judgment is not precluded if plaintiff's claim rests solely on unsupported allegations of motive. *Id.* at 365.

A. Political Firing Claim

For purposes of the motion for summary judgment, except for the question of motive, the facts relating to plaintiff's claim that he was fired in retaliation for his political activities are largely undisputed. Thacker commenced working as a water plant operator for the City of Hurricane at its water plant in April 1977. Defendant Raymond Peak (hereinafter, Mayor Peak) has been Mayor of Hurricane on and off for twenty-five to thirty years. Thacker is an active member of the Republican party and Mayor Peak is a Democrat. However, mayoral elections in Hurricane are not held along traditional party lines. Rather, the ballot designates the opponents as being members of either the Peoples Party or the Citizens Party, with no distinguishable alignment with the Republican and Democratic parties. Mayor Peak has been elected under the auspices of the Citizens Party. The other defendants' political affiliations in local elections is not ascertainable on the record before the court except that defendant Steve Sovine campaigned door-to-door for the Citizens Party during one recent election. (Sovine Dep. at 8).

In 1979, approximately two years after Thacker started working for the Water Board, Mayor Peak was defeated by L.I. Williams. Thacker supported Williams by passing out information and leaflets on his behalf at stores and on public sidewalks. (Thacker Dep. at 61). Mayor Peak was reelected in 1981 and retained that position through the period of Thacker's discharge in 1989, some eight years later. Although Thacker testified that he would have supported anyone who ran against Mayor Peak, it appears that Mayor Peak ran unopposed in subsequent elections. (Thacker Dep. at 65). Thacker alleges that he opposed Mayor Peak because he practiced political favoritism with respect to water plant employees. By way of example, Thacker points to the following associations: (1) Allen McCallister, chief operator at the water plant, is a Republican and the son of a man who worked for Peak for over twenty years as maintenance foreman; (2) Tim Lilly, a water plant operator, is a Republican who supported Peak, and the son of Doug Peak's secretary, a long-time city employee; (3) Sean Counts, the part-time employee who replaced Thacker, although not a registered voter, is the son of Mayor Peak's secretary; (4) Mark Stowers, a water plant operator, is the nephew of the long-time city superintendent; and (5) defendant Jack Gibson, who was appointed to the Water Board by Mayor Peak, is the husband of the city recorder. As to those employees who are Republicans, plaintiff contends that they nonetheless were supporters of Mayor Peak and his Citizens Party. In plaintiff's view, the defendants were motivated to discharge him so they could similarly give his position to someone loyal to Mayor Peak, although the position is not one for which political affiliation is an appropriate requirement.

Shortly after Williams defeated Mayor Peak in 1979, Doug Peak encountered Thacker at a bowling alley and told him he knew that Thacker did not support his father. There is no evidence that the other defendants, including Mayor Peak, knew that Thacker campaigned against Mayor Peak.

In December 1987, Doug Peak was appointed to the position of assistant superintendent for the city.[2] Thacker was outspoken in opposing the appointment. (Thacker Dep. at 31). Approximately six months later, Doug Peak was promoted to full superintendent. Around that same time, Thacker's shift assignment and work hours were changed with a corresponding reduction in compensation. According to Charles Alan McCallister, the chief water plant operator, prior to that time Thacker worked a straight forty-eight hour shift, from Friday evening to Monday morning, and did not take vacations. (McCallister Dep. at 39). Under that schedule, Thacker earned eight hours of overtime, which was lost when he was switched to an eight-hour shift. (Thacker Dep. at 31). Although Thacker contends that the change was made by Doug Peak because he opposed Doug Peak being hired as superintendent, (Thacker Dep. at 31), McCallister testified that the change was at his recommendation, (McCallister Dep. at 39).

Thereafter, on January 10, 1989, Thacker appeared at a meeting of the Water Board and requested seven weeks back vacation pay. The Board, upon motion made by defendant Steve Sovine and seconded by defendant Mayor Peak, approved payment. However, the Board's action was reversed by a letter from Doug Peak to Thacker dated February 16, 1989, advising him that the Board had received a report from its attorney that under city ordinances, the back vacation pay could not be paid.[3] At that same meeting, the city adopted a written policy governing vacations. In pertinent part, the policy provided:

*Vacation Rules for All Employees*

1. Must be signed up for vacation by the 15th of february [sic].

2. If you have not signed up by the deadline, your vacation will be assigned.

. . . .

4. Vacation will be given on seniority.

. . . .

7. No vacation may be carried over or not taken and paid without the prior written approval by the appropriate board.

As the senior employee, Thacker had first choice on vacation dates. He testified at deposition that he first asked Doug Peak whether he had to take the vacation if he signed up for it and then wanted to reschedule it. When told that he would have to take the vacation, he declined to sign up and told Doug Peak that he did not want to take a vacation. In accordance with the policy, three separate weeks of vacation were assigned for him. The first week commenced on April 10, 1989.

As reflected in the minutes of the meeting, on March 13, 1989, before Thacker's first scheduled week of vacation, the following events took place: Superintendent Doug Pack told the Water Board that "Alan McCallister, Chief water plant operator, had advised him that Kennith [sic] Thacker had said 'He didn't have to follow rules and regulations of the board'.[4] The board, after discussion, advised the Supt. to do whatever was necessary to see that the vacation and other rules were enforced."

---

**2.** Although Thacker asserts that Doug Peak was appointed to that position by his father, defendants contend that he was hired separately by the Water Board, the Sewer Board and the City Council.

**3.** The letter effectively disputes plaintiff's contention that Doug Peak unilaterally decided not to pay the past vacation pay authorized by the Board inasmuch as there is no evidence that the

city's attorney did not give the advice reflected in the letter.

**4.** Thacker denies making this statement to McCallister and also denies that McCallister told him that he could be terminated if he failed to take the vacation scheduled for him. However, in his deposition, Thacker said: "Everybody knew well ahead of time that I wasn't going to take a vacation." (Thacker Dep. at 55).

On April 10, 1989, at 11:00 p.m., the beginning of his regular shift, Thacker appeared for work. Within a short time, Sean Counts, who was scheduled as Thacker's vacation replacement, arrived. Pursuant to previous instructions from Doug Peak, Counts called him and reported Thacker's presence at the water plant. Doug Peak, accompanied by defendant Steve Sovine, went to the water plant. When asked by Doug Peak what he was doing there, Thacker testified that he said that he was working, to which Doug Peak responded: "No, you're supposed to be on vacation." (Thacker Dep. at 55). According to Thacker, Doug Peak then told him that his services were no longer needed. (*Id.*). Doug Peak's version of what happened is slightly different. According to him, when he asked Thacker to leave, Thacker told him "that he didn't have to leave, that he didn't have to take his vacation." (Doug Peak Dep. at 54). He further testified that he viewed Thacker's refusal to leave the water plant as a threat to the stability of all city employees and insubordination inasmuch as Thacker knew another employee was scheduled to work his job that night. (*Id.* at 53–54).

Defendants contend that based on the above facts, Thacker has presented insufficient evidence that his dismissal was politically motivated. In support, they point to the absence of widespread terminations at the time the administration changed when Mayor Pack last resumed office and the fact that three of the other four water plant operators employed at the time Thacker was discharged were also Republicans. In addition, they note that Counts, the part-time employee who replaced Thacker, has no political affiliation and is not even a registered voter. Defendants also maintain that the ten year lapse between the only claimed protected activity—handing out campaign literature for candidate Williams—and the dismissal is an insufficient nexus between the political activity and the firing to show more than mere speculation that the dismissal was motivated by the campaign activity. As an added factor, they assert that Thacker's political affiliation and campaign activity were unknown to them. Defendants further contend that even if the facts support an inference that Thacker's political activity was a motivating factor in his dismissal, they have presented sufficient evidence that his insubordination was an independent factor upon which they reached the same result.

In response, plaintiff contends that he was not insubordinate on the night of April 10, 1989, inasmuch as he did not act in an abusive or threatening manner in insisting that he wanted to work. Plaintiff also claims that he did not violate the city's vacation policy because the rules do not state that vacations must be taken, only that vacations may not be "carried over or not taken and paid" without prior written approval. In other words, plaintiff contends that he was entitled to work without pay and, in his view, firing him for wanting to work is so ludicrous it cannot be the real reason. Consequently, plaintiff argues, defendants have offered a "non-reason" for dismissing him and the real reason must be his affiliation with another political team and his opposition to Doug Peak's appointment to the position of superintendent.

■ The following principles are applicable to plaintiff's claim that he was terminated because of activities protected under the First Amendment. Unless political affiliation is an appropriate job requirement, it is unconstitutional to dismiss a public employee solely on the basis of the employee's political affiliation. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *see Elrod v. Burns*, 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *see also Jones v. Dodson*, 727 F.2d 1329, 1334 (4th Cir.1984) (citing *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294; *Elrod*, 427 U.S. 347, 96 S.Ct. 2673). Dismissal on the basis of political allegiance, or lack thereof, to a particular political candidate or officeholder is similarly protected. *Barton v. Manchin*, 686 F.Supp. 139 (S.D.W.Va.1988). In addition, a public employee may not be discharged for expressing ideas on a "'matter of legitimate public concern' ... unless the public employer's 'interest in the effective and efficient fulfillment of its responsibilities to the public' outweighs the

employee's interest in free expression of the ideas." *Jones*, 727 F.2d at 1334 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Meyers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983)).

■ Nonetheless, "notwithstanding proof (or concession) that a public employee's discharge was based at least in part upon overt expressive conduct, party affiliation, or both, an employer may yet avoid liability for violation of protected first amendment rights by proving that the discharge would have been made in any event for reasons unrelated to any exercise of protected first amendment rights." *Jones*, 727 F.2d at 1335. Thus, a determination of the actual reason for the discharge is frequently dispositive of the claim. *Id.*

Cases in which either party affiliation or political allegiance is shown to be the sole reason for the discharge are called "raw patronage" cases. *See id.* at 1336. In a raw patronage case, the only permissible justification for the dismissal is a showing that the affiliation is essential to the employee's effective discharge of the responsibilities of the position held. *Id.* On the other hand, cases in which the employee alleges that protected activity was the motivating factor in his discharge and the employer counters that the discharge was for an unrelated legitimate reason are characterized as "mixed motive" cases. *Jones*, 727 F.2d at 1335.

Mixed motive cases involving expressive conduct require a three-part inquiry, with each part affording "a possible independent basis for judgment" and the order of inquiry being subject to variance depending upon the facts of the case. *Daniels v. Quinn*, 801 F.2d 687, 689 (4th Cir.1986). First, as a matter of law, it must be determined whether the expressive conduct was about a "matter of legitimate public concern." *Id.* A public employee's active support of a political candidate of choice is a matter of public concern and thus is entitled to protection. *Pierson v. Gondles*, 693 F.Supp. 408, 412 (E.D.Va.1988). By contrast, matters of purely personal concern, such as an employee's grievance over inter-

nal working conditions, are not afforded First Amendment protection. *Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 879–80 (4th Cir.1984); *see also Huang v. Board of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir.1990); *Johnson v. Town of Elizabethtown*, 800 F.2d 404, 406 (4th Cir.1986) (citing *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690).

If the expressive conduct is on a matter of public concern, the second step involves a resolution of the motivational question. *Daniels*, 801 F.2d at 689. On that issue, plaintiff has the initial burden of showing that the protected conduct was a "motivating factor" in the employer's adverse employment decision. *Id.* (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). The burden then shifts to the employer to show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected activity." *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. In other words, the employer must show that "the unrelated motive was an independently effective one." *Jones*, 727 F.2d at 1336. Stated differently, would the employee have been dismissed "but for" the protected activity? *Daniels*, 801 F.2d at 689.

■ When differing views are offered with respect to the motivating factor behind the employee's dismissal, the critical issue is a determination of the real reason. *Jones*, 727 F.2d at 1336; *Barton*, 686 F.Supp. at 147. If the " 'evidence raises genuine issues as to the actual reason for an employee's discharge,' the motivational issue must be resolved by the trier of fact." *Jones*, 727 F.2d at 1337. Circumstantial evidence may be sufficient to support an inference that the discharge was politically motivated. *Kercado Melendez v. Aponte Roque*, 641 F.Supp. 1326, 1334 (D.P.R. 1986), *aff'd*, 829 F.2d 255 (1st Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); *see Wright v. Phipps*, 765 F.Supp. 1544, 1549 (W.D.Va. 1990), *aff'd*, 935 F.2d 268 (4th Cir.1991). Nonetheless, an inference that protected

activity was the sole motivating factor, must rise to the level of a "reasonable probability" rather than a "speculative possibility." *Jones,* 727 F.2d at 1339; *Wright,* 765 F.Supp. at 1547 (citing *Jones,* 727 F.2d at 1339). In other words, the employee's mere conjecture about the causal link between the protected activity and the adverse employment decision is insufficient to establish that the protected activity was the "but for" cause of discharge. *Johnson,* 800 F.2d at 406–07. Rather, there must be evidence that the motive for dismissal is "traceable" to the protected activity. *Huang,* 902 F.2d at 1141. In the absence of such evidence, a jury could not reasonably find the "requisite 'but for' causation," and summary judgment is appropriate. *Id.*

A lack of evidence that the defendant "engaged in any general housecleaning on raw patronage grounds" weighs heavily against an inference that the discharge was solely on the grounds of protected activity. *Jones,* 727 F.2d at 1339. Similarly, strong evidence of a specific motive unrelated to the protected activity diminishes any inference to the contrary. *See id.* A lack of evidence that the defendants knew the employee's political affiliation or that of the person who filled the resulting vacancy also detracts from an inference that politics was a motivating factor. *Laskaris v. Thornburgh,* 733 F.2d 260, 265–66 (3d Cir.), *cert. denied,* 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984). On the other hand, replacement of an employee with opposing political affiliations with a member of the party currently in control supports a strong inference of political discrimination. *Nevarez v. Gaztambide,* 633 F.Supp. 287, 292 (D.P.R.1986), *rev'd on other grounds,* 820 F.2d 525 (1987). The failure to provide the employee with an otherwise legitimate reason for the discharge until after suit is commenced also suggests that the proffered justification is not the real reason for the adverse decision. *Id.* at 293. Indeed, the entire circumstances surrounding the incident of dismissal may support an inference one way or the other on the motivation question. *Kercado Melendez,* 641 F.Supp. at 1334–36.

If it is determined that the discharge would not have occurred "but for" the protected activity, the third inquiry involves a weighing of the public interest in the employee's statement against the employer's obligation "to manage its internal affairs and provide 'effective and efficient' service to the public." *Daniels,* 801 F.2d at 689–90 (citing *Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1691–94); *Jones,* 727 F.2d at 1336 (citing *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691). Resolution of the balance of interest test is a question of law for the court. *Jones,* 727 F.2d at 1334, 1336 (citing *Connick,* 461 U.S. at 150 & n. 10, 103 S.Ct. at 1692 & n. 10).

Inasmuch as the parties are in disagreement over the motivating factor causing Thacker's discharge, this action is appropriately analyzed under the three-step inquiry applicable to mixed motive cases. Looking first at the expressive conduct prong of the inquiry, the court identifies three activities having a possible relationship to Thacker's dismissal: (1) his political support for Mayor Peak's opponent in 1979; (2) his opposition to Doug Peak being in the position of superintendent; and (3) his conduct with respect to the vacation policy. Thacker does not contend that his conduct in protesting the vacation policy is entitled to protection under the First Amendment and inasmuch as it would fall clearly within the unprotected category of matters affecting purely personal concerns, that activity, not being a matter of public concern, cannot form the basis of his First Amendment claim. On the other hand, his campaign activities are within the category of expressive conduct entitled to protection. For this step of the inquiry, the court also assumes, without deciding, that Thacker's views about Doug Peak being superintendent are also a matter of public concern.

Turning next to the motivational issue, two possible motives are offered. Thacker contends that he was discharged because of his political affiliation, while the defendants assert that his insubordination in failing to comply with the city's vacation policy was the unrelated real reason for his dismissal. The evidence relied on by Thacker

to meet his initial burden of showing that protected activity was a motivating factor in the defendants' decision to terminate his employment consists of the following: his campaign activities against Mayor Peak in 1979, which were known to Doug Peak; his opposition to Doug Peak being superintendent; the denial of his back vacation pay and the change in his work schedule shortly after Doug Peak's assumption of the superintendent's position; replacing him with the son of Mayor Peak's politically loyal secretary; the number of water plant employees who are either loyal to Mayor Peak or relatives of those loyal to him; and the "non-reason" given for his termination.

In assessing the inferences that can be drawn from the facts relied on by plaintiff, the court first finds that the campaign activities against Mayor Peak ten years prior to Thacker's dismissal are too remote in time to support an inference that any of the defendants were motivated to discharge him because of those activities. Similarly, Thacker's opposition to Doug Peak's becoming superintendent and his subsequent discharge more than two years later are far enough apart that no more than the slightest inference can be drawn that the one event is traceable to the other. Neither can an inference of political retaliation be drawn from the denial of back vacation pay or the change in work schedule after Doug Peak became superintendent. In each instance, the defendants have pointed to evidence, which has not been refuted by the plaintiff except through conclusory allegations, that they did not initiate those decisions. To the contrary, the evidence shows that the decision to award back vacation pay, although originally supported by defendants Sovine and Mayor Peak, was subsequently reversed solely on the advice of the city's attorney. The uncontradicted evidence also shows that the work schedule changes were implemented on the recommendation of McCallister, the chief operator. Inasmuch as those decisions are attributable to persons other than the defendants, they are of no value in supporting an inference that the defendants were hostile to Thacker because of his political expressions or otherwise.

The court also finds unpersuasive the plaintiff's contention that the defendants have offered a "non-reason" for his discharge because there is no evidence of insubordination and thus there must be another real reason. Contrary to Thacker's assertion, insubordination does not require a showing of abusive or threatening conduct. It is defined simply as "disobedience to constituted authority" or the "[r]efusal to obey" an order from one entitled to give it and have it obeyed. *Black's Law Dictionary* 801 (6th ed. 1990). It is undisputed that Thacker refused to take his scheduled vacation and leave the water plant on the night of April 10, 1989, until after Doug Peak fired him. Thacker argues that his presence at work that night did not violate the city's vacation policy. However, he does not contend that Doug Peak or the other defendants lacked the authority to implement the policy by assigning another worker to take his place during the time he was scheduled to be gone. Had Doug Peak allowed Thacker to work that night, another employee's work assignment would have been disrupted. It was proper for Doug Peak to exercise control over the internal operations of the water plant and make the decision that the employee assigned to work that night would remain and that Thacker would be asked to leave. It was clear at the time it occurred that Thacker was fired only after he refused the request to leave the work area. Consequently, the defendants cannot be said to be offering a delayed or manufactured justification for their actions from which it could be inferred that another impermissible motive was the real reason for the action taken.

What remains, then, is evidence that Thacker's position was filled by the son of Mayor Peak's secretary and that other water plant employees and board members are loyal to Mayor Peak. That evidence supports an inference of favoritism towards family members of loyal political supporters. Indeed, defendants point out that Thacker's own father worked at the water plant for nearly twenty years. What is lacking, however, is any evidence that

the long-time city workers were hired by Mayor Peak as a reward for political support. Their lengthy employment with the city is equally strong support for the inference that employment decisions were void of any political consideration. That inference is strengthened by the plaintiff's failure to show the dismissal of any other employees who opposed Mayor Peak or spoke out against the hiring of Doug Peak.

In sum, there is no evidence that Thacker's discharge was on raw patronage grounds and strong evidence that the factor motivating his dismissal was his conduct in reporting for work knowing that another employee was scheduled to be there in his stead. Moreover, the time lapse between any of Thacker's protected speech activities and his subsequent discharge is too long to support more than a conjecture that there is an association between the two events. That conjecture is insufficient to raise a genuine issue about the real reason for plaintiff's discharge or to establish that protected activities were the "but for" cause of his termination.

Given the paucity of evidence to support the inference that political allegiance rather than an unrelated motive was the real reason for Thacker's discharge, a jury could not reasonably find that he would not have been terminated "but for" the protected speech activities. Accordingly, the defendants are entitled to summary judgment on plaintiff's First Amendment claim.

## B. Breach of Contract Claim

In his complaint, Thacker alleges that his termination was a breach of an implied contract of continued employment in the absence of wrongdoing on his part. In support, his complaint states that his continued employment throughout several elections and changes in political administration led him to believe that his employment would not be terminated in the ab-

sence of wrongdoing. (Compl. at ¶¶ 11–12). At deposition, Thacker also claimed that at the time he was hired, Ernie Strickland, then superintendent of public works, told him he would not be fired "[u]nless I would really do something wrong." (Thacker Dep. at 19).

Defendants seek summary judgment on the breach of contract claims on the basis of the statute of frauds and West Virginia case law holding that any promises alleged to alter the state's employment at-will presumption must be very definite to be enforceable. Alternatively, defendants contend that Thacker's discharge was for cause.

Plaintiff's response to the motion for summary judgment is silent with respect to the breach of contract claim. However, after the pretrial conference held in this action, where counsel was asked about the continued viability of the claim, counsel wrote a letter to the court urging denial of the motion on the grounds that there is a genuine issue of fact about whether an implied contract exists and relying on case law holding that the state's employment at-will presumption may be contractually altered. (Letter from Bias to court of May 4, 1992). As an additional fact supporting the existence of a contract, counsel states in the letter that "[i]t appears to be the City's practice to continue employment indefinitely after someone is hired," and that plaintiff could observe that "once hired, city employees traditionally remained employed as long as they desired." Plaintiff further maintains that inasmuch as the statute of frauds defense was not affirmatively raised in defendants' answer, it should be deemed waived.[5]

■■■■ Whether a contract exists is generally a question of fact reserved for the jury. *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986), syl. pt. 4. None-

---

**5.** Rule 8 of the Federal Rules of Civil Procedure requires a statute of fraud defense to be affirmatively plead. Defendants' failure to do so in this instance is readily explained by the complaint's lack of reference to an oral contract. It appears that the oral contract was first mentioned in Thacker's deposition on February 5, 1992, more

than nine months after defendants filed their answer, but only days before they filed their motion for summary judgment. Under the circumstances, defendants timely raised the defense and are not precluded from doing so by Rule 8.

theless, the question may be removed from the jury's consideration when the plaintiff has failed to establish a prima facie right of recovery. *Id.* 342 S.E.2d at 457. In addition, as is discussed *infra* p. 383, to avoid application of the statute of frauds, an oral contract not in fact performed within one year must yet be shown by clear and convincing evidence before the question of its existence is submitted to the jury.

■ With respect to Thacker's claim that his termination was in breach of an oral contract of permanent employment, West Virginia's Statute of Frauds provides in pertinent part: "No action shall be brought ... [u]pon any agreement that is not to be performed within a year ... [u]nless the offer, promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent." W.Va. Code § 55-1-1 (1981 Repl.Vol. & 1991 Cum. Supp.). In order to come within the statute of frauds, "a verbal contract must expressly or by necessary implication provide for performance beyond a year, or contain nothing consistent with complete performance within a year." *Thompson v. Stuckey,* 171 W.Va. 483, 300 S.E.2d 295, 297 (1983). The statute has thus been interpreted as excluding contracts that are "capable, by reasonable construction, of full performance by one side within a year." *Id.* 300 S.E.2d at 298 (citing *Smith v. Black,* 100 W.Va. 433, 130 S.E. 657 (1925)).

The "capable of performance" exception has been further relaxed in those instances where "the disputed contract was not in fact performed within one year." *Id.* 300 S.E.2d at 299. However, in order to guard against unreliable claims, the existence of the oral contract must be proved by clear and convincing evidence before the claim is submitted to a jury. *Id.* "[T]he oral testimony of the beneficiary alone is a slender reed upon which to support a judgment" based on breach of an oral contract. *Id.* at 298. Additional evidence of the contract "may include circumstantial evidence, ap-

parent reliance, similar practices of the defendant in particular or of the industry in general in similar situations, or anything else that will convince the court that the defendant has been protected from an utterly spurious claim." *Id.*

Here, Thacker attempts to buttress his testimony that he had an oral contract of continued employment by the conclusory statement of counsel that it "appears" that it is the practice of the city to retain employees indefinitely once they are hired. However, even assuming that the statement of counsel could be substantiated by competent testimony at trial, thereby persuading the court that there is sufficient evidence to permit the question of the existence of an oral contract to go to the jury, plaintiff must yet show that the promise of continued employment is definite enough to overcome West Virginia's at-will employment presumption.

■ West Virginia law presumes that the employment relationship is at-will. *Suter v. Harsco Corp.,* 184 W.Va. 734, 403 S.E.2d 751, 754 (1991). Under the at-will doctrine, employment for an indefinite duration is "terminable at the will of either party, with or without cause." *Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270, 273 (1978). A party seeking a determination that the relationship was other than at-will has the burden of rebutting the at-will presumption. *Suter,* 403 S.E.2d at 754. The employment at-will status may be contractually altered by provisions relating to discharge or job security. *Cook,* 342 S.E.2d at 457. However, because of the at-will presumption, "any promises alleged to alter that presumptive relationship must be *very definite* to be enforceable." *Suter,* 403 S.E.2d at 754 (emphasis in original). By way of example, an employee handbook containing a promise that employees will not be discharged except for specified reasons and purporting to set forth a complete list of the reasons, is sufficiently definite to alter the at-will status of the employment and create an enforceable contract under which the employee may not be terminated except for the stated reasons. *Cook,* 342 S.E.2d at

459. Because they are so uncommon, offers for lifetime employment must similarly "be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." *Williamson v. Sharvest Mgt. Co.*, 187 W.Va. 30, 415 S.E.2d 271, 274 (1992). Indeed, even an employer's statement that "he would 'take care' of the [employee] as long as he performed his duties satisfactorily [is] not definite enough to create a lifetime employment contract." *Id.* 415 S.E.2d at 275–76.[6]

West Virginia also recently recognized that in the absence of a written contract of permanent employment, a plaintiff may establish an implied contract through custom and usage or practice. *Adkins v. Inco Alloys Int'l, Inc.*, 417 S.E.2d 910 (W.Va. 1992) (not yet released for publication). Again, the employee must show "by clear and convincing evidence that the practice occurred a sufficient number of times to indicate a regular course of business and under conditions that were substantially the same as the circumstances in the case at issue." *Id.* at 918. An employee's subjective interpretation of events is not enough to establish a policy binding on the employer under an implied contract theory. *Id.*

Plaintiff's proffered evidence on the existence of an implied contract falls far short of meeting West Virginia's exacting requirement that only a very definite promise will serve to rebut the at-will employment presumption. Thacker points to no written statement that city employees would be discharged only for specific reasons. Indeed, even the statement allegedly made by Strickland that Thacker would not be fired unless he really did something wrong is not a sufficiently definite promise to alter the at-will relationship because the statement does not purport to make reference to a complete list of wrongdoing upon which discharge might be based. Consequently,

Thacker cannot show a very definite promise that he would not be discharged except for specific reasons which would not include his conduct on the night of April 10, 1989.

Nor, in response to defendants' motion, has Thacker submitted affidavits or other admissible evidence to show that the city engaged in the practice of promising permanent employment or of retaining employees who similarly failed to comply with the city's vacation policy. Moreover, there is nothing in the record before the court to suggest that plaintiff is prepared to offer any other evidence to support his sense that other city employees were promised permanent or lifetime employment. Thacker's subjective impression that once hired, city employees remained employed as long as they desired is insufficient as a matter of law to form the basis for an implied contract based on custom and usage or practice.

Thus, Thacker's only evidence of an express or implied contract of permanent employment is his own statement that he was promised that he would not be fired unless he really did something wrong. That statement alone does not provide clear and convincing evidence of an oral contract or other promise of permanent employment. Moreover, it is not a clear and unequivocable expression of permanent employment. Rather, it is the equivalent of an assurance that he would be taken care of as long as his work was satisfactory. Under the West Virginia Supreme Court's holding in *Williamson*, a promise of that general nature is not definite enough to rebut the at-will presumption and create a permanent employment contract.

Inasmuch as plaintiff has failed to establish a prima facie right of recovery under either an express oral contract or implied contract of permanent employment, defen-

---

**6.** In *Williamson*, the West Virginia Supreme Court recognized that an implied lifetime employment contract might be enforceable "where the employee furnishes sufficient consideration in addition to those services incident to the terms of his or her employment." *Williamson*, 415 S.E.2d at 275. Inasmuch as there is no indication that Thacker provided any additional consideration in accepting employment with the Water Board, he cannot maintain a cause of action under that theory.

dants are entitled to summary judgment on his breach of contract claims.[7]

## C. Defamation Claims

After Thacker's employment was terminated, he applied to the West Virginia Department of Employment Security (hereinafter, DES) for unemployment benefits. In his complaint, Thacker alleges that at a hearing held on his benefits claim, defendant Doug Peak "falsely and maliciously testified that plaintiff had been 'Discharged for failure to abide Rules and Regulations, Insubordination.'" (Compl. ¶ 15). The record before the court shows that the statement was actually written on a DES form entitled "REQUEST for SEPARATION INFORMATION" as an explanation for Thacker's discharge. At hearing, Doug Peak testified that Thacker was fired after he refused the order to leave the water plant. (Trans. DES hearing at 22–23).

Thacker's complaint also alleges that after his discharge, defendants "falsely and maliciously maligned and defamed plaintiff" by telling prospective employers who inquired of them that "he had been fired for insubordination and that he was not a good employee." (Compl. ¶ 16). In response to the motion for summary judgment, counsel states that plaintiff had over one hundred applications for employment rejected and that at least three prospective employers have said that Mayor Peak and Doug Peak gave him "extremely bad references." (Pls.' Mem. in Response at unnumbered 4). Counsel also suggests that inasmuch as the Peaks worked several miles from the water plant and did not work closely with Thacker, they were not in a position to evaluate his work.

With respect to the defamation claim based on statements made during the DES proceedings, defendants seek summary judgment on the grounds that they are absolutely privileged. Plaintiff resists the motion on the argument that the notation on the DES form is not true as evidenced by Doug Peak's subsequent testimony and that West Virginia law does not provide a privilege "for an employer who discharges an employee for one reason but records another reason on the employee's records." (Pls.' Mem. in Response at unnumbered 9).

As to the defamation claim based on statements made to prospective employers, defendants contend that they are subject to a qualified privilege recognized by other jurisdictions as applicable to former employers in evaluating a prior employee at the request of a prospective employer. In the view of the defendants, none of the factors sufficient to overcome the qualified privilege are applicable here. In response, plaintiff argues that any qualified privilege that does exist has been overcome by a showing of malice. According to plaintiff, malice is the only way to explain why prospective employers were told that he was

7. In light of the court's finding that Thacker was an at-will employee, his due process claim must fail. In order to claim protection under the due process clause, Thacker must show that he has a constitutionally protected liberty or property interest. *Stone v. University of Md. Medical Sys. Corp.,* 855 F.2d 167, 172 (4th Cir.1988). No property interests being created by the Fourteenth Amendment, *Richardson v. Town of Eastover,* 922 F.2d 1152, 1156 (4th Cir.1991), the interests must be derived from an independent source, *Bannum, Inc. v. town of Ashland,* 922 F.2d 197, 200 (4th Cir.1990). Here, West Virginia law does not provide plaintiff, an at-will employee, with a protected property interest in his employment and he points to no other source of the claimed right. Consequently, there is no protection under the due process clause and Thacker was not entitled to a hearing before his discharge.

The conspiracy claim must also fail. The only basis for the claim discernible to the court is the discussion at the March 13, 1989, meeting of the Water Board to the effect that in dealing with Thacker, Doug Peak should do whatever was necessary to enforce the vacation policy and other rules of the city. To prevail on a civil conspiracy claim, Thacker must show "that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner." *Cook,* 342 S.E.2d at 460 (quoting *Dixon v. American Indus. Leasing Co.,* 162 W.Va. 832, 253 S.E.2d 150 (1979) syl. pt. 1). There being nothing wrongful in the defendants' decision to enforce the City's rules and policies, plaintiff cannot recover under a civil conspiracy theory.

With respect to the complaint's reference to an equal protection claim, the court is unable to ascertain the basis for the claim or otherwise detect how plaintiff purports to have received unequal treatment. The claim is accordingly not further addressed.

**386**

fired for failure to follow rules and regulations and insubordination when the real reason was his refusal to take a vacation.

Where the circumstances under which a communication is made are not in dispute, "the question of privilege is entirely one of law for the court." *Higgins v. Williams Pocahontas Coal Co.*, 103 W.Va. 504, 138 S.E. 112, 113 (1927). Here, the circumstances surrounding the alleged defamatory statement to the DES are not in dispute: A form from DES requesting information about Thacker's discharge is signed by Doug Peak and contains the statement that he was "[d]ischarged for failure to abide Rules and Regulations. Insubordination."

West Virginia's statutory scheme governing unemployment compensation contains the provision that "[n]o action for slander or libel, either criminal or civil, shall be predicated upon information furnished by any employer or any employee to the commissioner in connection with the administration of any of the provisions of this chapter." W.Va.Code § 21A–10–11 (1989 Repl.Vol. & 1991 Cum.Supp.). The statement by Doug Peak on the DES form was in response to a question asked by DES about the employer's reason for Thacker's discharge. As such, it is information furnished in connection with the administration of Thacker's claim for unemployment benefits within the provisions of section 21A–10–11. Consequently, under the statute, even if the statement was false or maliciously made, it is not actionable and plaintiff is unable to recover on a defamation claim based on the communication. Defendants are thus entitled to summary judgment on the defamation claim based on the communication to the DES.

In general, West Virginia law provides that "[a] qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70, 78 (1983) (quoting *Swearingen v. Parkersburg Sentinel*

*Co.*, 125 W.Va. 731, 26 S.E.2d 209, 215 (1943)). A qualified privilege supports the " 'public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public.' " *Id.* (quoting *Restatement (Second) of Torts* ).

Unlike an absolute privilege, where motive is irrelevant, a qualified privilege may be destroyed by abuse. *Id.* While a showing of actual malice is the primary means of defeating a qualified privilege, it may also be lost by showing:

(1) an intentional publication of false defamatory material ... (2) a publication of false defamatory material in reckless disregard for its truth or falsity ... (3) a publication of false defamatory material made to persons who have no reason to receive the information ... and (4) a publication of false defamatory material with a primary purpose unrelated to the purpose of the privilege.

*Id.* (citations omitted).

West Virginia has not applied the general principles enunciated in *Crump* to circumstances in which a former employer is asked by a prospective employer to comment on an employee's work performance. However, West Virginia recognizes that "[a] qualified privilege usually extends to employer-employee relations." *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216, 221 (1981). In that context, the court in *Mauck* upheld the trial court's determination that statements by the manager of the City of Martinsburg in a dismissal letter sent to a city employee, with copies to members of the city council and the city attorney, were protected by a qualified privilege. *Id.* In the court's view, the communication was privileged because it dealt with the employee's dismissal, a matter of interest to the city manager, and the letter was published only to others having a lawful interest in the dismissal. *Id.*

In the earlier case of *Parker v. Appalachian Electric Power Co.*, 126 W.Va. 666, 30 S.E.2d 1 (1944), the West Virginia Supreme Court also extended a qualified priv-

ilege to an employer's statements about a former employee. In *Parker*, the West Virginia Division of Vocational Rehabilitation wrote to Appalachian Electric Power, Parker's former employer, and inquired whether they would rehire him. *Id.* 30 S.E.2d at 2. In response, the power company gave several derogatory reasons for refusing the State's request to rehire Parker. Among the reasons given by the power company were that, in providing information to the State, Parker inaccurately reported his employment history with the company and, further, that he had engaged in dishonest tactics in pursuing his earlier disability claim against the company. *Id.* at 3. The court held that the communications were conditionally privileged inasmuch as they concerned "an important interest of both the publisher and the recipient," and the recipient was one to whom the communication could be made " 'within the generally accepted standards of decent conduct.' " *Id.* at 4–5 (quoting *Restatement of Torts* § 595).

In later defamation actions of first impression, the West Virginia Supreme Court has also found the *Restatement (Second) of Torts* to be persuasive authority. For example, in *Havalunch, Inc. v. Mazza*, 170 W.Va. 268, 294 S.E.2d 70, 75 (1981), the court stated:

> We have never had a case directly on this point in West Virginia, and while there are numerous old West Virginia defamation cases from which we could draw by loose analogy, the issue is sufficiently unique that the better course is to adopt the majority rule on this discrete subject as it has been articulated elsewhere in American law. A good point of entry is the Restatement (Second) of Torts.

The court, accordingly, turns to the *Restatement* for guidance on how West Virginia would decide the qualified privilege presented here.

The *Restatement* provides in pertinent part for a qualified or conditional privilege under the following circumstances:

> § 595. Protection of Interest of Recipient or a Third Person

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

> (a) there is information that affects a sufficiently important interest of the recipient or a third person, and

> (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

> (2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

> (a) the publication is made in response to a request rather than volunteered by the publisher or

> (b) a family or other relationship exists between the parties.

*Restatement (Second) of Torts* § 595 (1977).

Section 595 is made applicable to communications by a former employer to a present or prospective employer about the character or conduct of an employee under the following guidelines:

> The defamatory imputations, however, must be made for the purpose of enabling that person to protect his own interests, and they must be reasonably calculated to do so. Accordingly, only information that is likely to affect the honesty and efficiency of the servant's work comes within the privilege.... Imputations that have no connection with the work that the servant is to perform, or with the position that he will occupy in the [prospective employer's] employment, are outside the scope of the privilege. If, however, there is a request by the present or prospective employer for specific information, the answer may be privileged although it might otherwise be irrelevant to the employee's work.

§ 595 cmt. i.

In conformity with the *Restatement's* position, a number of states have recognized a qualified privilege in the giving of employee references in response to a request from a prospective employer. *E.g., Ken-*

388

*ney v. Gilmore,* 195 Ga.App. 407, 393 S.E.2d 472 (1990), *cert. denied,* ("a prima facie privilege shields statements made concerning a current or former employee by a current or former employer to one, such as a prospective employer, who has a legitimate interest in such information"); *Chambers v. American Trans Air, Inc.,* 577 N.E.2d 612, 615–16 (Ind.Ct.App.1991) (finding that "[a]s a general rule an employee reference given by a former employer to a prospective employer is clothed with the mantle of a qualified privilege"); *Alford v. Georgia–Pacific Corp.,* 331 So.2d 558 (La.Ct.App.), *writ denied,* 334 So.2d 427 (1976) (recognizing a qualified privilege for communications between former and prospective employers when statements are made in good faith and for legitimate purpose); *Erickson v. Marsh & McLennan Co., Inc.,* 117 N.J. 539, 569 A.2d 793 (1990) (applying qualified privilege to employer's communications in response to unsolicited inquiries from prospective employers of discharged employee); *Swanson v. Spiedel Corp.,* 110 R.I. 335, 293 A.2d 307 (1972) (recognizing qualified privilege in communications between former and prospective employers).

As noted in *Chambers,* "[t]here is a self-evident social utility in free and open communications between former and prospective employers concerning an employee reference." *Chambers,* 577 N.E.2d at 615–16. "Without the protection of the privilege, employers might be reluctant to give sincere yet critical responses to requests for an appraisal of a prospective employee's qualifications." *Id.* at 615; *see also Alford,* 331 So.2d at 562 (refusal to recognize the privilege "would either tend to stifle communication of qualifications and character evaluations, inherently subjective in nature, or alternatively, would breed deception in its wake"). The privilege has also been said to protect the former's employer's interest in being able to "seek and receive the same information when about to hire new employees." *Swanson,* 293 A.2d at 310.

 Inasmuch as West Virginia has already recognized a qualified privilege with respect to certain statements by an employer about an employee and the privilege sought here is in accordance with the *Restatement's* position and that of several states addressing the issue, the court is satisfied that West Virginia would recognize a qualified privilege for communications by a former employer when solicited by a prospective employer and limited to matters related to the employee's work.

 Here, counsel suggests that because the Peaks worked some distance from the water plant, they were not sufficiently knowledgeable about Thacker's work performance to evaluate it. However, their positions as former employers is not disputed and, other than the suggestion of counsel, there is no indication that they were unfamiliar with Thacker's overall work practices. Nor is it contended that the information relayed by them was unsolicited or communicated to anyone other than prospective employers having a legitimate interest in the information. Neither does plaintiff allege that the communications were about matters unrelated to his employment. The court accordingly finds that the communications are protected by a qualified privilege.

Inasmuch as it has been determined that the defendants' communications to Thacker's prospective employers are protected by a qualified privilege, the burden shifts to Thacker to show that the privilege was lost through abuse. *Kenney,* 393 S.E.2d at 473; *Chambers,* 577 N.E.2d at 616. Where the facts are not in dispute, the question of whether a qualified privilege has been defeated through abuse is a question of law for the court. *Crump,* 320 S.E.2d at 81.

The only information presented by plaintiff with respect to the contents of the allegedly defamatory communications are the unsubstantiated statements by counsel that Thacker was told "by at least three prospective employers that the defendants, Raymond and Douglas Peak had given him extremely bad references." (Pls.' Mem. in Response at unnumbered 3). Counsel further states that "when prospective employers called the defendants to ask about plaintiff's work record, they were not told

that he refused to take a vacation (a trait which many employers might have loved). They were told he refused to follow rules and regulations and was insubordinate." (*Id.* at unnumbered 10). According to counsel, there could be no purpose for those statements "if not malice." (Letter from Bias to court of April 30, 1992). No affidavits from prospective employers were submitted nor is there any reference to deposition testimony which would substantiate counsel's statements about what they asked and were told.

Even had plaintiff presented affidavits supporting the statements of counsel that three prospective employers were told by defendants Mayor Peak and Doug Peak that Thacker was discharged for insubordination and failure to follow rules and regulations, those facts fall far short of meeting plaintiff's burden, in response to the motion for summary judgment, of coming forward with specific facts showing that there is a genuine issue of fact warranting jury determination of whether the qualified privilege is defeated by actual malice. On the record before the court, there is nothing to evidence any ill-will or malice towards the plaintiff in answering the inquiries from prospective employers.[8] Rather, based on the undisputed facts developed in the record, it appears that the defendants did nothing more than explain the reason Thacker was discharged. No malice can be inferred from an accurate explanation of why he was terminated. The purpose of the statements then was to give an honest response to a legitimate question within the scope of the privilege recognized by the court. It is accordingly concluded that plaintiff has failed to make a prima facie showing of an abuse of the qualified privilege protecting the defendants' communications with prospective employers.

 Although not raised by the defendants in their motion, inasmuch as the court has rejected plaintiff's contention that he was not insubordinate, *supra*, p. 381, defendants would also be entitled to summary judgment on both of plaintiff's defamation claims by interposing the defense of truth. As earlier noted, plaintiff was properly asked to leave the water plant on the night of April 10, 1989, so that another employee could perform the work assigned to him that night. The refusal to obey the request, made in conjunction with the city's rules and regulations regarding vacation policy, was an act of insubordination. Thus, plaintiff has failed to establish the falsity of the statements that he was fired for failing to follow rules and regulations and for insubordination. Defendants accordingly are entitled to summary judgment on the defamation claims under the defense of truth as well as the defense of privilege.

### III. *Conclusion*

For the reasons set forth above, it is ORDERED that the motion for summary judgment of defendants Douglas R. Peak, individually and in his official capacity as superintendent of the Water Board of the City of Hurricane, West Virginia, Raymond Peak, Gene Young, E.E. Nichols, Jack H. Gibson and Steve Sovine, individually and

---

**8.** For the same reasons the court determined that the facts relied on by plaintiff to support his political firing claim are insufficient to show an improper motive, the court finds that the events prior to Thacker's discharge do not support an inference of malice in the communications to prospective employers after discharge. Similarly, there is no reference to additional events occurring after Thacker's discharge that imply actual malice towards him. Indeed, there is some question about whether the events complained of actually occurred. In his deposition, Mayor Peak stated that he received one inquiry but advised the caller that he did not give references over the telephone. (Mayor Peak Dep. at 61). Although he advised the caller that he would respond to a written inquiry, none was received. (*Id.*) Doug Peak testified that he received some calls and told the callers that Thacker was terminated from employment but "could do about anything he wanted to if he had close supervision." (Doug Peak Dep. at 69–70). Counsel for defendants also state that they interviewed several prospective employers identified by Thacker in deposition as being able to support his claim of bad references and that none of those employers have any recollection of events that would support Thacker's assertions. Consequently, there is a question of fact about what occurred with respect to prospective employers. Nonetheless, for purposes of this motion, the court assumes as true counsel's representations of the communications and their contents.

as members of the Water Board of the City of Hurricane, West Virginia, and the City of Hurricane, West Virginia, be, and the same hereby is, granted.