ANDY SWEARINGEN *v.* THE PARKERSBURG SENTINEL COMPANY

(No. 9435)

Submitted April 27, 1943.  Decided June 1, 1943.

*Austin V. Wood* and *Ambler, McCluer & Davis,* for plaintiff in error.

*Russell, Hiteshew & Adams, James S. Wade* and *Wm. Bruce Hoff,* for defendant in error.

LOVINS, JUDGE:

This is an action of libel brought by Andy Swearingen

against The Parkersburg Sentinel Company, a corporation. The trial court rendered judgment for fifteen thousand dollars on a verdict for a like amount in favor of the plaintiff. The case is here on writ of error and supersedeas.

The plaintiff was a candidate for the office of mayor of the city of Parkersburg at the March, 1941, primary election. He was also a member of the city council of that city at the time the article and editorial hereinafter quoted were published. He does not complain of all the words in the article and editorial, but only those emphasized by italics in the quotations hereinafter appearing, are made the basis of this action. The defendant is the owner and publisher of The Parkersburg Sentinel, a newspaper with a daily circulation of approximately fourteen thousand copies in the city of Parkersburg and adjacent territory in the States of West Virginia and Ohio. The Parkersburg Sentinel of March 12, 1941, published an article on the front page reading as follows:

### "STATE AUDIT SHOWS CITY MONEY AFFAIRS MIXUP

"PARKERSBURG MUNICIPAL GOVERNMENT SEVERLY CRITICIZED BY STATE TAX OFFICE — BEGAN LAST FISCAL YEAR WITH $16,000 DEBT

"*The city of Parkersburg began the fiscal year 1940-1941 with a $16,007 indebtedness and facing charges that city council had transferred into the general fund, nearly twice that amount of money from sums intended for other purposes, according to the annual audit of the state tax commissioner.*

"A copy of the audit was received at the City building January 16, but was filed away without councilmanic comment. Neither has council ever reported on findings of the audit authorized by its body last year following publication of the state's 1939-1940 audit of city finances objected to by

city council at the time they were made public, on the grounds they were incorrect.

*"According to the audit for the fiscal year just past, some $33,262.04 has been transferred into the general fund under one pretense or another, or without pretense, when it was intended for other uses.*

## "MONEY DUE PENSION FUNDS

*"The most of this money is that due the police and firemen for their pension funds and increasing their annual compensation.*

"According to the state auditor's report, a balance of $8,092.91 paid into the general fund for the fiscal year ending June 30, 1940, and covering taxes collected from levies established by law for the purpose of the policemen's pension fund, is owed to and should be paid into that fund.

"A second sum of $3,576.50 represents a balance due from the general fund over the same period and covering taxes collected on levies for a like purpose for firemen, and is due and should be paid into the firemen's pension fund.

## "AMUSEMENT TAXES

"In addition to this, a total of $17,601.63 amusement tax collected has been paid into the general fund. The auditor's report shows:

" 'In accordance with provisions chapter 56, article 5, section 5, acts of the legislature, regular session 1937, a resolution was passed authorizing a special election to be held September 3, 1937, for the purpose of voting on an amendment to the city charter, authorizing levy and collection of an admission and amusement tax.

'1. For purpose of increasing annual compensation of officers and members of police and fire departments: and

'2. For such purpose as mayor and council of said City may lawfully direct.

" 'As a result of foregoing resolution and election, an ordinance was passed effective September

28, 1937, authorizing collection of tax effective October 8, 1937. Collections for current year are as follows:

" 'Smoot theatre, $3,979.39; Strand theatre, $2,-204.65; Hiehle theatre, $3,045.31; Burwell theatre $1,790.70; Virginia theatre, $2,514.34; Palace theatre, $1,643.94; The Brass Rail, $184.42 (June 1, 1939-May 31, 1940); Parker theatre, $1,267.53 (Sept. 9, 1939-May 31, 1940); The Coliseum, $591.76 (Feb. 1, 1939-May 31, 1939); Wallace Bros. circus, $32.65; Cole Bros. circus, $21.95; Parkersburg Riding club, $7.98; Farr Roller Drome, $175.53; World's Fair shows, $36.82; Wax Museum $85.91; Exposition Train show, $17.18; Swing Dance club, $1.75; total, $17,601.63'.

"Also a sum of $8.80, tax redemptions' balance from the state and due the sinking fund has been paid into the general fund.

### "CITY HOSPITAL MONEY

"Further, the audit shows where the city council members used nearly $4,000 of City hospital receipts for transfer into their general fund.

"The action is shown under the City hospital audit, headed 'transfer to general fund' with the report reading:

" 'March 8, 1940, voucher marked "for clerical service and supervision"—$3,973.20.' "

"Inasmuch as hospital records show in addition certain normal sums for supervision and clerical services, why it would be necessary to transfer another sum of this amount to the general fund for the same purpose, hasn't been indicated.

"The audit shows City Councilman Fred Cochran, in charge of the hospital, receiving his $3,000 salary from hospital receipts, and the superintendent's salary of $1,620 being paid, while for clerical services items total $1,099.68, not including keeping of records, etc., which is additional.

### "TRAVELING EXPENSES

"Among the disbursements from this general

fund, aside from the usual salaries, the state audit reports:

" 'Traveling expenses, H. W. Russell, $82.50; Earl Stephens, $39.50, and Andy Swearingen, $72.12'

*"Another record under general funds is that shown by the auditor in his report on 'classified disbursements' Nov. 13, 1939 to June 30, 1940, paving and sewer improvement funds, showing a transfer of $4,110.50, this for:*

" 'Part-time services of city engineer and clerical services, $2,295.03

" 'Part-time services city attorney, city clerk and other clerical services, $1,815.47.'

*"This is in addition to regular salaries for the city engineer, city attorney and city clerk, and salaries for stenographers for the former and assistants in the city clerk's office, shown elsewhere in the audit.*

"Regarding further disbursement, from the general fund, of $2,520, the auditor reported:

" 'Payments of $2,520 were made to the state sinking fund commission to apply on retirement of swimming pool revenue bonds and interest, but on June 3, 1939, an amount of $500 was repaid by check, leaving a balance due of $2,020.

" 'Finding: It is held that the amount of $2,-020 collected from tax levies and paid the state sinking fund commission to apply on retirement of swimming pool revenue bonds and interest is not in accordance with the code and same should be paid from the swimming pool fund.'

### "NOT PERMITTED BY LAW

"Objection to the practice of writing checks in the way of blanket vouchers, which the state auditor charges the city with having done, is also made on the grounds it is not permitted by law, inasmuch as there is no way of determining what articles were purchased or whom they were for.

"The auditor's remarks read:

" 'Disbursements in cash from the various funds cover labor, freight, express, postage, hospital supplies, traveling expenses, meters purchased, gasoline and other miscellaneous are not in accord with the following statute:

" ' " Chapter 12, article 3, section 19, West Virginia code, 1937, provides: 'It shall be unlawful for any county court, board of education or the council of a municipal corporation charged with administration of the fiscal affairs of any county, school district, independent school district or municipality, to issue any general order for a payroll or to any persons to be disbursed or distributed by him to those who have performed the service or furnished the material for which payment is to be made, but in all such cases the order shall be made to the person lawfully entitled to such payments.' "

## "EXAMPLE OF VIOLATION

"A violation of this is shown repeatedly, among them one in the City hospital records where there is listed:

" 'Cash purchases and expenses, Andy Swearingen, treasurer, $1,503.04.'

"And again in disbursements from the general fund where traveling expenses are listed as 'Earl Stephens, councilman, $35.90' etc., as heretofore referred to.

"Records of the water department show where council not only approved the purchase of a car for one of the water department collectors, but paid the insurance, though the audit showed the employee received the same salary as other collectors. Under salaries and labor, the audit shows:

" 'E. B. Elletson, $1,014.'

"Under 'new equipment' for the same department, is listed 'E. B. Elletson, one 1937 Ford tudor sedan, motor 183413476—$400' and under insurance, "policy 1273686 . . . on Ford tudor, motor No. 183413476, Sept. 1 to May 15, 1940, $16.92.'

"The audit shows that ex-police judge Ben

Nern failed to turn over a sum of $29.20 due the city.

"The report reads:

" 'Fines and costs collected July 1, 1939 to June 30, 1940, Ben F. Nern, ex-police judge. Balance due July 1, 1939, $29.20. Balance due June 30, 1940, $29.20', with a note:
" 'This balance represents costs collected on cases tried as ex officio justice-of-the-peace.'

## "BUILDING PERMITS

"Of the building commissioner's department, the auditor's report reads:

" 'Permits Nos. 5494 to 5499, inclusive, are not available and there is no record as to what disposition was made of them.'

"The audit of the R. J. A. Boreman fund shows the city took a loss on a loan of $3,500 to Clarence Sams who gave a mortgage against his property as security, failed to pay his taxes during the years of 1934, 1935, 1936, and 1937 totalling $185.02, plus an interest sum of $890.

"The auditor's report shows:

" 'Rent from Clarence A. Sams property on 821 William Street, December 1, 1939 to April 30, 1940, $125.

" 'Edgar B. Sims, state auditor, for taxes Clarence A. Sams property, 821 William Street for years 1934, 1935, 1936, and 1937, $185.02.

" 'R. E. Hays, sheriff for taxes on same for years 1938 and 1939, $72.20.

" 'Property of Sams deeded to city to cover loan March 16, 1926, conveyed by deed Nov. 17, 1939, recorded deed book 228, page 239, $3,500.

" 'City council accepted conveyance of said real estate from Clarence A. Sams and wife in full settlement and discharge of debt and obligation consisting of loan in amount of $3,500 past due interest in the amount of $890 and unpaid taxes 1934 to 1939 inclusive amounting to $4,647.22. Fire insurance in amount of $2,000 carried on prop-

erty. Rent on Sams property has been paid to April 30, 1940. Balance due and unpaid June 30, 1940, $50. Paid Sept. 6, 1940.' "

On page 12 of the newspaper of the same date, the following editorial appeared:

### "AUDIT OF CITY BOOKS

"The Sentinel prints today a resume of the criticism offered by the state tax commissioner's office of the system of bookkeeping, or lack of it, of the municipal government of Parkersburg. The criticism shows a woeful lack of adherence to recognized systems of public accounting by our city government.

*"The state tax commissioner for several years has been endeavoring to get the municipal authorities of Parkersburg to adopt and use a system of accounting and record keeping which would offer some guarantee of accuracy and honesty in our governmental affairs but thus far the Parkersburg city government has utterly ignored such recommendations, refused to carry them out and in a way defied the efforts of the tax commissioner to insure honesty in the conduct of city administration.*

"One year ago the city government took exception to the state audit as printed in this newspaper and proceeded to have another audit of its own made. Strange to say the audit has not been made public by the city officials. The state audit just issued makes serious criticism of the methods and actions of the Parkersburg city government. The article in this newspaper today should get the attention of all taxpayers and other citizens."

It is alleged that the italicized words in the article and editorial are false, defamatory, and from the usual construction and common acceptation are insults and tend to violence and a breach of the peace. The plaintiff alleges that the parts of the article and editorial hereinbefore indicated impliedly charged the plaintiff, as a

member of the city council of Parkersburg, with official misconduct in the following particulars:

(a) That the city council transferred the sum of approximately $32,014.06 into the general fund, which money was intended for other purposes, and that a misapplication or misappropriation thereof was made;

(b) That the city council had improperly transferred the sum of $33,262.04 into the general fund, and that such transfer was without reason and unjustified; and furthermore that the greater portion of the sum aforesaid either should have been kept in the police and firemen's pension funds, or was set apart to pay increased compensation to the personnel of the police and fire departments;

(c) That the said council had illegally paid the sum of $4,110.50 as salaries of the city engineer, city attorney, and city clerk, and for other clerical services; and

(d) That the city council was guilty of official misconduct, dishonesty, and gross neglect of duty in refusing to install the system of accounting and keeping of records prescribed by the state tax commissioner of West Virginia.

Defendant pleaded the general issue and also filed a special plea. The special plea, in effect, alleges it is the duty of the state tax commissioner to audit the accounts and examine the finances of the city; and is the duty of the officials of the city of Parkersburg to keep separate accounts of the various funds provided by levies. We think the special plea states correct principles of law applicable to the subject matter. Pleadings should state facts not law, and the purpose of including a statement of legal principles in the special plea is not perceived.

The special plea also sets forth in detail many and varied facts, some of which are unnecessary and immaterial for the purpose of this opinion.

The audit of the finances of the city of Parkersburg for the fiscal year 1939-1940 was made, and the defendant asserts in the special plea that the audit shows that the records of the city of Parkersburg were in confu-

sion: (a) transfers having been made from other funds to the general fund, and from the general fund to a sinking fund for retirement of revenue bonds; and (b) that disbursements had been made by general order embracing sundry items. We express no opinion as to such methods and attach no importance to the matters so pleaded.

It is further alleged in the special plea that under authority of an amendment to the charter of the city of Parkersburg, which had theretofore been adopted at a special election, the city council had collected taxes on admissions to places of amusement in the amount of $17,601.33, which sum was placed in the general fund rather than used for the purpose of paying increased compensation to policemen and firemen, enlarging their pension funds, and providing funds with which to pay the salaries of additional employees of the police and fire departments. There is no proof to substantiate the pleaded facts with reference to setting apart of the money derived from amusement taxes.

The special plea also charges that it is a reasonable inference from the audit that the city clerk, city attorney, and city engineer were paid in excess of their regular salaries, and that money was improperly paid for additional clerical services rendered to those officials. Analysis of the entries and comments in the audit discloses that no improper disbursements were made by the city council to the foregoing city officials or to persons performing clerical services for them.

The defendant further alleged in its special plea that a change in the accounting methods of the city government had been required by the state tax commissioner, which had not been made; and that criticism of the manner in which money due the city for licenses and water service appeared in the audit. Such portions of the audit as are found in the record discloses that the city government is criticized for failure to use the forms prescribed, and to follow the suggestions made by the state tax commissioner.

The defendant pleads specially the truth of the defamatory matter, and that it was published with good motive and for justifiable ends. As hereinbefore indicated, the entire truth of the portion of the article and editorial alleged to be defamatory is not established. Only that portion of the published words relating to criticism for failure to change the methods of accounting being sustained by comments appearing in the audit. Nothing appears in the audit from which an inference may be drawn that charges or criminal proceedings had been either commenced or threatened, or that the city had suffered any loss. Aside from the exceptions noted, the recitals made in the article and editorial are otherwise substantially true. But it may be said that the plaintiff introduced testimony which explained, and in some instances, tended to contradict the entries and comments appearing in the audit. Evidence was also introduced by the plaintiff which tended to show that no indebtedness existed at the commencement of the fiscal year 1939-1940, the apparent deficit disappearing when all accounts payable to the city were considered as assets. Furthermore, such evidence strongly tends to contradict any assertion that municipal funds had been misapplied or misappropriated.

Obviously, the audit of the fiscal affairs of the city of Parkersburg for the fiscal year 1939-1940, made by the state tax commissioner pursuant to Code, 6-9, and Section 10, Article 5 of Chapter 56, Acts of the Legislature, 1937, is the factual basis for the article and editorial. We do not ascribe to such audit the verity of a court record. But the audit being a public record with reference to public matters, it was a sufficient factual basis to protect the defendant from the charge of falsity when truthfully reported and published. However, the defendant did not adhere to the facts and figures appearing in the audit, in some instances understating, and in others overstating, which, taken together, constitute an untruth.

The prolix pleadings and overabundance of exhibits,

appearing in this record, do not tend to clarify the issues in this case.

The defendant alleges that the trial court erred in admitting improper evidence over defendant's objection; in excluding evidence offered by defendant; in giving instructions requested by plaintiff; in refusing to give instructions offered by defendant; and in overruling the motion of defendant to set aside the verdict and grant the defendant a new trial.

We only consider and discuss the assignments of error which we think are material and afford a rational basis for disposition of this controversy.

The defendant contends that the article and editorial are not admissible in evidence for the reason that the published words related to a group and not to an individual, and that the publication thereof was made on a privileged occasion. The statements of fact, comment, and criticism were directed toward the city council and mayor, which was a small restricted group of five persons, and, if the defamatory words are libelous, they may apply to any member thereof. The plaintiff pleaded and proved that he was a member of the city council, and as such was superintendent of accounts and finances, thus placing himself within the group, and this action is maintainable by him as sole plaintiff. *Ewell* v. *Boutwell*, 138 Va. 402, 121 S. E. 912.

It is also asserted that the article and editorial are inadmissible because they were published on a privileged occasion. We do not think this position is well taken. The substantive defense of qualified privilege does not affect the adjective question of admissibility of evidence.

The defense of qualified privilege is available to the defendant and the fact that it is an action of statutory libel brought under Code, 55-7-2, does not preclude such defense. *Alderson* v. *Kahle,* 73 W. Va. 690, 80 S. E. 1109, 51 L. R. A. (N. S.) 1198, Ann. Cas. 1916 E, 561; *Barger* v. *Hood,* 87 W. Va. 78, 104 S. E. 280. Moreover, such defense can be made under a plea of the general issue. *Rosenberg* v. *Mason,* 157 Va. 215, 160 S. E. 190.

The special plea of the defendant heretofore adverted to also pleads the following matters of law and fact which we deem to be the gist of the defense in this action: that it was the duty of defendant to call attention to the improper and illegal transfer of funds and the refusal of the city of Parkersburg to prescribe a system of accounting; that the publication was made for the purpose of protecting the defendant and other taxpayers of the city of Parkersburg from further mismanagement of the financial affairs of the city of Parkersburg; that the publication was privileged, being made honestly, in good faith, and in the belief that the financial records of the city were confused; that the publication was made without malice; and that the comment thereon was fair and legitimate. The foregoing essentially presents two defenses: (a) that the occasion was qualifiedly privileged; and (b) that defendant had the right to comment on, and criticize the acts of the plaintiff.

There are two classes of privileged occasion, one absolute, the other qualified. With the first we are not here concerned, except to say that when the occasion is one of absolute privilege, judgment is rendered for the defendant as a matter of law. *Ward* v. *Ward,* 47 W. Va. 766, 35 S. E. 873. In an action for defamation, if there is no dispute as to the words written or spoken, the fact of publication and other surrounding circumstances, the question of privilege or the lack thereof is one of law for the court. *Ward* v. *Ward, supra; Higgins* v. *Coal Co.,* 103 W. Va. 504, 138 S. E. 112; *Stewart* v. *Riley,* 114 W. Va. 578, 172 S. E. 791. Whether defendant abused or exceeded the privilege of the occasion is likewise a question of law to be determined by the court. *Stewart* v. *Riley, supra.* The existence or nonexistence of malice in fact, to be hereinafter discussed, however, is a question of fact for the jury. *Ward* v. *Ward, supra; Higgins* v. *Coal Co., supra; Stewart* v. *Riley, supra.*

It is reasonable to suppose that citizens and taxpayers of the city of Parkersburg were interested in fiscal affairs of their city, and that the audit thereof, made pursuant

to statute, was a matter of general concern and interest. Plaintiff was a public officer in whose actions the citizens of the city of Parkersburg had an interest, as well as the right to information relative to the manner in which he performed his official duties. The article and editorial related entirely to the finances and financial records of the muncipality, and the official duties of the plaintiff were directly connected with the subjects discussed and criticized in the article and editorial. Anything connected with the plaintiff's official duties was a proper subject of discussion, which, if made without malice, was not libelous. *Gandia v. Pettingill,* 222 U. S. 452, 32 S. Ct. 127, 56 L. Ed. 267. The publisher of a newspaper has no greater privilege to publish defamatory matter than any other person, *Sweeney v. Baker,* 13 W. Va. 158, 31 Am. Rep. 757; *Colcord v. Publishing Co.,* 106 W. Va. 419, 145 S. E. 751. But it cannot be overlooked that the publisher of a newspaper has a duty, as distinguished from the privilege, the former giving rise to the latter, to make known and discuss matters which relate to government and the welfare of the citizens in the community which it serves. Newell Slander and Libel, 4th Ed. 554. Such duty may be self-assumed, but that fact in no wise lessens its compelling force. That duty has been epitomized as follows: "A communication made bona fide upon any subject-matter in which the party communicating has an interest or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which without this privilege would be slanderous and actionable. The duty referred to need not be one binding at law; any moral or social duty of imperfect obligation will be sufficient". Newell Slander and Libel, 4th Ed., 416. A communication made on a subject in reference to which a person owes a moral duty is privileged. *Rigney v. Keesee & Co.,* 104 W. Va. 168, 139 S. E. 650, 54 L. R. A. 1139.

Applying the foregoing principles to the publication here under consideration, we reach the conclusion that

the publication was made on an occasion qualifiedly privileged, and that the defendant did not abuse or exceed the privilege of such occasion.

Having determined that the occasion was one of qualified privilege and that defendant did not abuse or exceed the privilege, either by vehemence of the published words or extravagant statement, the implication of malice is no longer present and the burden devolves upon plaintiff to prove *malice in fact.* *Ward* v. *Ward, supra; Rigney* v. *Keesee & Co., supra; Stewart* v. *Riley, supra;* also consult *Chafin* v. *Lynch,* 83 Va. 106, 1 S. E. 803-809; *Rosenberg* v. *Mason, supra; Montgomery Ward & Co.* v. *Watson,* 55 F. 2d 184.

In attempting to sustain the burden so cast upon him, plaintiff relied on publication of articles and editorials which appeared in May, 1938, as establishing *malice in fact.*

The publications in 1938 related to a controversy between the mayor, city council, the plaintiff being a member thereof, and the defendant, concerning the application of funds collected as a tax on admissions to places of amusement. The defendant then asserted that the money so collected was to be used to increase the salaries of policemen and firemen and to pay the salaries of additional firemen and policemen then necessary to be employed; and that such money should not have been applied to an increase in the salaries of the mayor and council. The mayor and councilmen of the city of Parkersburg, including plaintiff, vindicated their action by pointing out that their salaries were fixed by Section 11, Chapter 1, Acts of the Legislature, 1929 (Municipal Charters), which had been suspended by Section 1, Chapter 20, Acts of the Legislature of 1932, and that upon repeal of the latter statute by Section 23, Chapter 82, Acts of the Legislature, 1937, their salaries were automatically restored to their original amounts. The city officials further maintained that the money derived from the special tax on admissions was not set apart for any special purposes, but was properly placed in the general

fund. The first contention of the mayor and council was at least arguable, and the second contention was apparently right.

But aside from the merits of the controversy existing in 1938, which we do not appraise further, were the publications made in that year sufficient to establish *malice in fact? Malice in fact* "is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations". *Railway Co.* v. *Quigley,* 21 How. 202, 16 L. Ed. 73. The foregoing definition of *malice in fact* has been accepted in this jurisdiction. *Cooper* v. *Railway Co.,* 101 W. Va. 268, 132 S. E. 739; *Jopling* v. *Improvement Co.,* 70 W. Va. 670, 74 S. E. 943, 39 L. R. A. (N. S.) 814.

The publications made in 1938, when measured by what has been said herein, were qualifiedly privileged, being occasioned by the controversy hereinabove mentioned as to the fiscal affairs of the city. Reasonable men could have entertained different opinions about the subject of that controversy, and the conflicting views of the parties to that dispute involve the application of statutes fixing the salaries of the plaintiff and other officers of the city. The application of law to facts is a well known subject of debate between men learned in the law, as well as laymen. The publications made in 1938 do not evince any "spirit of mischief, or of criminal indifference to civil obligations" on the part of the defendant, nor is such spirit and indifference established as against the defendant by its failure to retract the publications made in 1938 or other evidence offered in that behalf.

The failure of the plaintiff to prove the indispensable element of *malice in fact* requires the reversal of the judgment of the trial court.

Discussion of the claimed right of the defendant to comment and criticize and other issues raised by the various assignments of error would be didactic rather than dispositive and hence unnecessary.

The judgment of the Circuit Court of Wood County is reversed, the verdict is set aside, and a new trial awarded the defendant.

*Reversed.*