IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 18-0461
_____

FILED
March 27, 2020
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JOHN R. ZSIGRAY,
Petitioner

v.

CINDY LANGMAN and
J.W. EBERT CORPORATION, D/B/A
"McDONALDS"
Respondents

_____

Appeal from the Circuit Court of Gilmer County
The Honorable Richard A. Facemire, Judge
Civil Action No. 16-C-17

AFFIRMED, IN PART, REVERSED, IN PART,
AND REMANDED WITH DIRECTIONS

_____

Submitted: March 4, 2020
Filed: March 27, 2020

William B. Summers, Esq.                    Robert L. Greer, Esq.
Parkersburg, West Virginia                  Jonathon W. Fischer, Esq.
Counsel for the Petitioner                  GREER LAW OFFICES, PLLC
                                            Clarksburg, West Virginia
                                            Counsel for the Respondents

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

## SYLLABUS BY THE COURT

1.      "'The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)." Syl. Pt. 3, *Chapman v. Kane Transfer Co., Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977).

2.      "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

3.      "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

4.      "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

5.      "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1983).

6. "An adverse expert witness enjoys civil immunity for his/her testimony and/or participation in judicial proceedings where such testimony and/or participation are relevant to said judicial proceedings." Syl. Pt. 2, *Wilson v. Bernet*, 218 W. Va. 628, 625 S.E.2d 706 (2005).

7. "Prior to the filing of a prospective judicial proceeding, a party to a dispute is absolutely privileged to publish defamatory matter about a third person who is not a party to the dispute only when (1) the prospective judicial action is contemplated in good faith and is under serious consideration; (2) the defamatory statement is related to the prospective judicial proceeding; and (3) the defamatory matter is published only to persons with an interest in the prospective judicial proceeding." Syl. Pt. 2, *Collins vs. Red Roof Inns, Inc.*, 211 W. Va. 458, 566 S.E.2d 595 (2002).

8. Judicial fact witnesses enjoy absolute immunity from defamation claims based on their trial testimony where such testimony is relevant to the judicial proceeding.

9. "'The existence or nonexistence of a qualifiedly privileged occasion . . . in the absence of controversy as to the facts, [is a] question [ ] of law for the court.' Syl. pt. 3, *Swearingen v. Parkersburg Sentinel Co.*, 125 W.Va. 731, 26 S.E.2d 209 (1943)." Syl. Pt. 6, *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1983).

10. "Qualified privileges are based upon the public policy that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. A qualified privilege exists when a person publishes a statement in good faith about a subject in which

he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter; however, a bad motive will defeat a qualified privilege defense." Syl. Pt. 4, *Dzinglski v. Weirton Steel Corp.*, 191 W. Va. 278, 445 S.E.2d 219 (1994).

11.     "In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Syl. Pt. 3, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998).

12.     "In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." Syl. Pt. 4, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998).

ARMSTEAD, Chief Justice:

Petitioner John R. Zsigray ("Mr. Zsigray") filed a civil action against Respondents Cindy Langman ("Ms. Langman") and the J.W. Ebert Corporation, d/b/a "McDonalds," alleging claims for libel and slander ("defamation"), outrage, and intentional infliction of emotional distress. The circuit court granted Ms. Langman's Rule 12(b)(6) motion to dismiss the defamation claim, but allowed Mr. Zsigray's remaining claims to go forward. Following discovery, the circuit court granted Ms. Langman's summary judgment motion on the outrage and intentional infliction of emotional distress claims. Mr. Zsigray subsequently filed this appeal.

After review, we affirm the circuit court's order granting summary judgment on the outrage and intentional infliction of emotional distress claims. We affirm, in part, and reverse, in part, the circuit court's order granting Ms. Langman's motion to dismiss the defamation claim. We remand this matter to the circuit court for further proceedings consistent with our ruling herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 8, 2015, Mr. Zsigray and his wife placed an order at the drive-thru window at the McDonald's restaurant in Glenville, West Virginia. Mr. Zsigray asserts that he ordered a "plain chicken sandwich" but only received a plain chicken patty with no bun. Upon discovering that he had received a plain chicken patty, Mr. Zsigray returned to the first drive-thru window, explained that his order was incorrect, and demanded a refund. A McDonald's employee directed him to proceed to the second drive-thru window. Ms.

1

Langman, the restaurant's manager, was at the second window when Mr. Zsigray arrived.

Mr. Zsigray's description of what occurred at the second window is as follows:

> And we pulled to the next window and there Cindy Langman [was] for whatever reason. And she was trying to give me a lecture on the sandwich and I didn't want a lecture on the sandwich. I asked for a refund. So I called her a stupid f---ing b---- again and she give me my refund and we left. The next thing I know, I have a warrant out for arrest for harassment.

Immediately after this incident, Ms. Langman contacted the West Virginia State Police. West Virginia State Trooper K.J. Varner ("Trooper Varner") was dispatched to the restaurant. Trooper Varner's investigation included both an interview with Ms. Langman and a written statement that she prepared for him. The investigation revealed that Mr. Zsigray had been involved in a prior incident at this McDonald's in which he used vulgar language toward Ms. Langman and allegedly used a racial epithet toward an African-American employee[1] over a dispute involving pancake syrup. This earlier incident occurred a few months prior to the May 2015 incident. In subsequent deposition testimony, Mr. Zsigray described the pancake syrup incident as follows:

> When I got to the window to pick them [pancakes] up, I asked Cindy Langman – at that time I didn't know who she was – if she would give me some extra syrup please, and her reply was she was tired of giving me extra syrup all the time. And I like said to myself, "Whoo [sic], who is this woman."
>
> But anyways, I told her, I said, "Ma'am, I don't want you to give me anything, but I do want extra syrup, so put it in the bag and, if you need to, charge me for it."

---

[1] Mr. Zsigray denied this allegation.

2

Well, she just went on and on and I told her just give me back my money.  So when she put the money in my hand she told me not to come back and I just looked at her and called her a stupid f---ing b---- and drove off.

Ms. Langman told Trooper Varner that Mr. Zsigray used foul language toward her, and that "she felt very threatened by him and his actions and does not feel safe with him."[2]  Trooper Varner's criminal complaint states that he reviewed "the aforementioned interaction [depicting the chicken sandwich incident] . . . on video surveillance and observed Mr. Zsigray open the drive-thru window after a worker had closed it to keep him from yelling into the business."[3]  Based upon Trooper Varner's

---

[2] Ms. Langman's written statement provides:

Mr. Zegrey [sic] has been through the store several times in the past and has had police speak to him in [the] past about his belligerent behavior and his foul language to me and my workers.

Today he came through[,] placed his order and received it.  He proceeded to come back and say it was wrong and use foul language again at my workers and myself.  He told me he wanted his f---ing refund and shut the f--- up.  I told him I would get his money and not to cuss at me or my workers, he proceeded to say: I f---ing do what I f---ing want and if you don't like it, I can come in there and show you how [I] can f---ing cuss.  I told him to leave and he said he will do what he f---ing wants and I can't stop him from coming in this store if I want to try, he will make sure I will f---ing know what he can and can't do.  I feel very threatened by him and his actions and behavior.  I do not feel safe with him.

[3] The video surveillance did not include audio.

3

investigation, Mr. Zsigray was charged with criminal harassment pursuant to W. Va. Code § 61-2-9a(b).[4] The matter proceeded to a jury trial in magistrate court. Ms. Langman testified during this trial. The jury found Mr. Zsigray not guilty of criminal harassment.

After the magistrate court trial concluded, Mr. Zsigray filed a complaint alleging defamation, outrage, and intentional infliction of emotional distress against Ms. Langman, and her employer, the J.W. Ebert Corporation, d/b/a McDonalds. The defamation claim was based on 1) Ms. Langman's oral and written statements to Trooper Varner, and 2) her testimony during the magistrate court trial. The complaint alleged that the defendants, Ms. Langman and the J.W. Ebert Corporation, "slandered and libeled the Plaintiff by intentionally and maliciously making false and misleading statements both orally and in writing in the public domain and in Court with the intent to damage . . . the Plaintiff."

Ms. Langman filed a Rule 12(b)(6) motion to dismiss Mr. Zsigray's lawsuit. While this motion sought to dismiss the entire lawsuit, it mainly addressed the defamation claim. Ms. Langman argued that her statements "were not defamatory, they were privileged communications and they were not false statements." Further, Ms. Langman asserted that her statements "are absolutely privileged as they were made to law

---

[4] W. Va. Code § 61-2-9a(b) provides "(b) Any person who repeatedly harasses or repeatedly makes credible threats against another is guilty of a misdemeanor and, upon conviction thereof, shall be incarcerated in the county or regional jail for not more than six months or fined not more than one thousand dollars, or both."

enforcement as a preliminary step to initiation of a judicial action and then to the jury in the pendency of the judicial action." Ms. Langman argued that if the circuit court determined that her statements to Trooper Varner and in the magistrate court trial were not absolutely privileged, they "are still [entitled to] qualified privilege as they were made by [Ms. Langman] in an attempt to protect herself, her employees and the Defendant McDonalds' interests."

The circuit court granted Ms. Langman's motion to dismiss the defamation claim by order entered on April 17, 2017. The circuit court determined that Ms. Langman's statements to Trooper Varner were "made during the institution of a judicial proceeding, and therefore those statements are . . . absolutely privileged." The circuit court also found that Ms. Langman's "statements made at the [magistrate court] trial were made in the course of a judicial proceeding and are therefore absolutely privileged." The circuit court denied the motion to dismiss on the outrage and intentional infliction of emotional distress claims, and the case proceeded to discovery.

Following discovery, Ms. Langman filed a motion for summary judgment on the outrage and intentional infliction of emotional distress claims. The circuit court granted the motion, concluding that

> [t]he Court finds that Defendant Langman's conduct cannot reasonably be considered so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Defendant Langman was working in a public place, and she had just encountered the plaintiff for a second time, wherein the plaintiff, by his own admission, for a second time used inappropriate and aggressive language towards her. It does not exceed the bounds of decency or offend community

5

notions of acceptable conduct for an individual working in a restaurant to report an incident with a customer to law enforcement. Seeking the assistance of law enforcement and the criminal justice system is not extreme and outrageous conduct as a matter of law.

Additionally, the court concluded that based on Mr. Zsigray's own testimony regarding the incident, "the Court does not find that it [Ms. Langman's reporting the incident to the police] was extreme or outrageous." After the circuit court entered its summary judgment order on April 20, 2018, Mr. Zsigray filed the instant appeal.

## II. STANDARD OF REVIEW

Mr. Zsigray appeals the circuit court's orders granting Ms. Langman's 1) Rule 12(b)(6) motion to dismiss the defamation claim, and 2) summary judgment motion on the outrage and intentional infliction of emotional distress claims. We therefore set forth our standards of review when considering a circuit court's ruling on a Rule 12(b)(6) motion to dismiss and on a summary judgment motion.

This Court has explained that "[t]he purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the complaint." *Collia v. McJunkin*, 178 W. Va. 158, 159, 358 S.E.2d 242, 243 (1987) (citations omitted). "'The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)." Syl. Pt. 3, *Chapman v. Kane Transfer Co., Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977). "Dismissal for failure to state a claim is proper where it is clear

6

that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Murphy v. Smallridge*, 196 W. Va. 35, 36, 468 S.E.2d 167, 168 (1996) (Internal quotation omitted.) Further, "[a]ppellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

We have held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Further,

> [s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995). With these standards as guidance, we proceed to consider the parties' arguments.

### III. ANALYSIS

Mr. Zsigray alleges that the circuit court erred in granting Ms. Langman's 1) motion to dismiss the defamation claim, and 2) summary judgment motion on the outrage and intentional infliction of emotional distress claims. We address each argument in turn.

### A. Defamation

We first consider the circuit court's ruling granting Ms. Langman's motion to dismiss Mr. Zsigray's defamation claim. The initial step when assessing a

7

defamation/libel claim[5] is to determine whether the plaintiff is a public or private figure.[6] There is no question that Mr. Zsigray is a private figure. This Court set forth the elements of a defamation action by a private individual in syllabus point one of *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1983): "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury."

The Court summarized the *Crump* standard in *Bine v. Owens*, 208 W. Va. 679, 683, 542 S.E.2d 842, 846 (2000), stating that

> to have a defamation claim, a plaintiff must show that false and defamatory statements were made against him, or relating to him, to a third party who did not have a reasonable right to know, and that the statements were made at least negligently on the part of the party making the statements, and resulted in injury to the plaintiff.

---

[5] Mr. Zsigray's defamation action concerns both written and oral allegations. *See* Syl. Pt. 8, *Greenfield v. Schmidt Baking Co., Inc.*, 199 W. Va. 447, 485 S.E.2d 391 (1997) ("Defamation published in written form, as opposed to spoken form, constitutes libel.").

[6] In syllabus point two of *State ex rel. Suriano v. Gaughan*, 198 W. Va. 339, 480 S.E.2d 548 (1996), this Court held:

> Under West Virginia law, a libel plaintiff's status sets the standard for assessing the defendant's conduct. Plaintiffs who are public officials or public figures must prove by clear and convincing evidence that the defendants made their defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not. Private figures need only show that the defendants were negligent in publishing the false and defamatory statement.

Mr. Zsigray's complaint alleges two distinct instances of defamation: 1) Ms. Langman's testimony during Mr. Zsigray's magistrate court trial, and 2) her oral and written statements to Trooper Varner during his investigation of the chicken sandwich incident. The circuit court concluded that Mr. Zsigray could not satisfy the second *Crump* element—nonprivileged communication to a third party. It ruled that both of Ms. Langman's statements—her trial testimony and her statement to Trooper Varner—are "absolutely privileged" under our case law. We review each of these rulings.

First, we consider whether the circuit court erred by ruling that Ms. Langman's testimony during the magistrate court trial was absolutely privileged. This Court discussed witness immunity in *Davis ex rel. Davis v. Wallace*, 211 W. Va. 264, 267, 565 S.E.2d 386, 389 (2002):

> The law regarding witness immunity is sparse in West Virginia . . . *Historically, in West Virginia and in other jurisdictions, witnesses have been regarded as having an absolute immunity regarding their testimony given during a trial.* This immunity encourages witnesses to speak freely without the specter of subsequent retaliatory litigation for their good faith testimony. The immunity was created at common law to shield the percipient [fact] witness who was called into court to testify as to what he saw, heard, or did that was relevant to an issue in the case.

(Emphasis added, internal citation and quotation omitted.)[7]

---

[7] A number of courts outside of our jurisdiction have held that judicial witnesses enjoy absolute immunity from defamation claims based on their trial testimony. In *Rioux v. Barry*, 927 A.2d 304, 307-08 (Conn. 2007), Connecticut's Supreme Court explained that

Additionally, in *Wilson v. Bernet*, 218 W. Va. 628, 625 S.E.2d 706 (2005), this Court addressed whether the testimony of an adverse expert witness should be absolutely privileged. The Court held that "[a]n adverse expert witness enjoys civil immunity for his/her testimony and/or participation in judicial proceedings where such testimony and/or participation are relevant to said judicial proceedings." Syl. Pt. 2, *Wilson*. In reaching this holding, the Court in *Wilson* relied on a United States Supreme Court case

> [t]he purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . [T]he possibility of incurring the costs and inconvenience associated with defending a [retaliatory] suit might well deter a citizen with a legitimate grievance from filing a complaint. . . . Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine [of absolute immunity] was intended to protect nevertheless faced the threat of suit.

(Internal citation omitted.) *See also Browne v. Saunders*, 768 A.2d 467 (Del. 2001) (Witnesses are absolutely immune from liability at common law for making false or defamatory statements in judicial proceedings as long as the statements were related to the proceeding); *Doe v. Roe*, 295 F. Supp. 3d 664 (E.D. Va. 2018) (In Virginia, a testifying witness enjoys absolute immunity for any defamatory statements made during a judicial proceeding, provided those statements are relevant to the subject matter of the proceeding); *Thomas v. State*, 294 F. Supp. 3d 576 (N.D. Tex. 2018) (Absolute privilege to parties and witnesses who participate in judicial proceedings from having to answer civil actions in damages for libel or slander extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings).

10

that discussed the common law history and rationale underlying witness immunity from

civil damages:

> Preeminent among such tribunals is the United States Supreme Court, which addressed the immunity issue in *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Reviewing early English and American jurisprudence, the Court explained that "the common law's protection for witnesses is a tradition . . . well grounded in history and reason." 460 U.S. at 334, 103 S.Ct. at 1115, 75 L.Ed.2d at 107. "In short, the common law provided absolute immunity from subsequent damages liability for all persons . . . who were integral parts of the judicial process." 460 U.S. at 335, 103 S.Ct. at 1115-16, 75 L.Ed.2d at 108. Such protection was deemed to be necessary in order that "the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." 460 U.S. at 333, 103 S.Ct. at 1114, 75 L.Ed.2d at 106. For this reason, "[t]he common law recognized that . . . [a]bsolute immunity is . . . necessary to assure that . . . witnesses can perform their . . . function . . . without harassment or intimidation." 460 U.S. at 335, 103 S.Ct. at 1115, 75 L.Ed.2d at 108. Such immunity traditionally was conditioned only upon the prerequisite that the witness's "statements were relevant to the judicial proceeding" in which they were made. 460 U.S. at 331, 103 S.Ct. at 1113, 75 L.Ed.2d at 105.

218 W. Va. at 632-33, 625 S.E.2d at 710-11 (Internal quotations and citation omitted.)[8]

_____

[8] In *Briscoe*, the United States Supreme Court recognized that a witness who could be sued for damages "might be reluctant to come forward to testify. . . . And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability." 460 U.S. 325, 333, 103 S.Ct. 1108, 1114 (1983). Further, the Supreme Court noted that "[a] witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." *Id.* Based on these concerns, the Supreme Court concluded that "the truth-finding process is better served if the witness' testimony is submitted to the

11

In *Collins vs. Red Roof Inns, Inc.*, 211 W. Va. 458, 566 S.E.2d 595 (2002), this Court considered whether a party to a prospective lawsuit is absolutely privileged to publish defamatory material about a third person. The Court, relying on the Restatement (Second) of Torts § 587 (1977),[9] answered the question in the affirmative and held that

> [p]rior to the filing of a prospective judicial proceeding, a party to a dispute is absolutely privileged to publish defamatory matter about a third person who is not a party to the dispute only when (1) the prospective judicial action is contemplated in good faith and is under serious consideration; (2) the defamatory statement is related to the prospective judicial proceeding; and (3) the defamatory matter is published only to persons with an interest in the prospective judicial proceeding.

Syl. Pt. 2, *Collins*.

While the Court in *Collins* did not address the precise factual scenario before us—a fact witness making an allegedly defamatory statement about a party to a lawsuit during her trial testimony—its holding is instructive to the instant case. The Court in

---

crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." 460 U.S. at 333-34, 103 S.Ct. at 1114-15, 75 L.Ed.2d at 106-07 (Internal quotation and citation omitted.)

[9] The Restatement (Second) of Torts § 587 provides, in relevant part:

> A party to private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

12

*Collins* noted that, in general, absolute privilege attaches to a party in a judicial proceeding "based upon the public interest of encouraging access to the court system while facilitating the truth-seeking process therein." 211 W. Va. at 464, 566 S.E.2d at 601 (Internal citation omitted.)  We find this rationale applies equally to the present case.

Further, as in *Collins*, we find guidance on this issue in the Restatement (Second) of Torts.  It provides "*[a] witness is absolutely privileged to publish defamatory matter concerning another* in communications preliminary to a proposed judicial proceeding or *as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.*" Restatement (Second) of Torts § 588 (1977) (Emphasis added.) One comment to § 588 provides the rationale for this rule:

> a. The function of witnesses is of fundamental importance in the administration of justice. The final judgment of the tribunal must be based upon the facts as shown by their testimony, and it is necessary therefore that a full disclosure not be hampered by fear of private suits for defamation. The compulsory attendance of all witnesses in judicial proceedings makes the protection thus accorded the more necessary. The witness is subject to the control of the trial judge in the exercise of the privilege. For abuse of it, he may be subject to criminal prosecution for perjury and to punishment for contempt.

This Court has also addressed absolute privilege in the context of a lawyer disciplinary proceeding.  Rule 2.7 of the West Virginia Rules of Lawyer Disciplinary Procedure provides

> [a]ll information provided, documents filed or testimony given with respect to any complaint, investigation or proceeding under these rules shall be privileged in any action for defamation. All members of the Board, of the Lawyer Committee on Assistance and Intervention, Disciplinary

13

Counsel, and their employees, shall be absolutely immune from civil suit in the same manner as members of the judiciary in this State for any conduct in the course of their official duties.

In *Farber v. Dale*, 182 W. Va. 784, 787, 392 S.E.2d 224, 227 (1990), this Court ruled that "a defendant who has been sued for libel as a result of testimony given before the West Virginia State Bar Legal Ethics Committee is entitled to absolute immunity from such suit, as provided by Article VI, Section 43 of the West Virginia State Bar Constitution."

Based on all of the foregoing, including our prior case law, the Supreme Court's ruling in *Briscoe*, and the Restatement (Second) of Torts, we hold that judicial fact witnesses enjoy absolute immunity from defamation claims based on their trial testimony where such testimony is relevant to the judicial proceeding.[10] Therefore, we agree with the

---

[10] As previously discussed, this Court held in syllabus point two of *Wilson* that an adverse expert witness enjoys civil immunity for their testimony in a judicial proceeding where such testimony is relevant to the judicial proceeding. 218 W. Va. 628, 625 S.E.2d 706. The Court in *Wilson* cautioned that "[i]n rendering this ruling, we do not, however, address those circumstances in which an expert witness's testimony or participation in judicial proceedings may constitute criminal activity insofar as Dr. Wilson has not alleged in his underlying civil action that any of the defendants' actions rise to the level of criminal conduct." 218 W. Va. at 635, 625 S.E.2d at 713. Likewise, we note that our ruling herein addresses the facts of the present case—a fact witness facing a defamation claim based on her trial testimony. We echo comment a. to § 588 of the Restatement (Second) of Torts which provides that "[t]he witness is subject to the control of the trial judge in the exercise of the privilege. For abuse of it, he [or she] may be subject to criminal prosecution for perjury and to punishment for contempt."

14

circuit court's ruling that Ms. Langman's testimony during the magistrate court trial is entitled to absolute immunity from Mr. Zsigray's defamation claim.

Next, we review the circuit court's ruling that Ms. Langman's statements to Trooper Varner, made during his investigation of the chicken sandwich incident, were also absolutely privileged. The circuit court explained that these statements were "made during the institution of a judicial proceeding, and therefore those statements are . . . absolutely privileged." We disagree with the circuit court's ruling and conclude that Ms. Langman's statements made to Trooper Varner during his investigation are potentially entitled to qualified privilege, rather than absolute privilege.

We have previously held that "'[t]he existence or nonexistence of a qualifiedly privileged occasion . . . in the absence of controversy as to the facts, [is a] question [ ] of law for the court.' Syl. pt. 3, *Swearingen v. Parkersburg Sentinel Co.*, 125 W.Va. 731, 26 S.E.2d 209 (1943)." Syl. Pt. 6, *Crump*, 173 W. Va. 699, 320 S.E.2d 70. This Court further addressed qualified privilege in syllabus point four of *Dzinglski v. Weirton Steel Corp.*, 191 W. Va. 278, 445 S.E.2d 219 (1994):

> Qualified privileges are based upon the public policy that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter; however, a bad motive will defeat a qualified privilege defense.

Qualified privileges have been recognized in a number of situations, including the discharge of a public duty, reports of public proceedings, and "fair comment on matters of public concern." *Crump*, 173 W. Va. at 707, 320 S.E.2d at 78 (Citations omitted.) "Although motive is irrelevant when an absolute privilege is involved, a bad motive will defeat a qualified privilege defense." *Id.*[11]

In a case similar to the present matter, Wal-Mart was sued for defamation by a customer after an employee contacted the police based on the belief that the customer may have been engaging in a fraudulent scheme. The Court in *Belcher v. Wal-Mart Stores, Inc.*, 211 W.Va. 712, 568 S.E.2d 19 (2002), determined that qualified privilege attached to the employee's statement to the police officer. The Court explained that

> [t]he Wal-Mart employees recognized a legitimate need to investigate a suspicious receipt in the context of the ongoing investigation into the theft of a similar computer from a Pennsylvania store by the use of a falsified receipt obtained from the Nitro store. The receipt used in the Pennsylvania connivance had been obtained from the Nitro store on the same date as the Appellant's receipt and was for the same item. Under those circumstances, we find that the communication to the police officer was privileged and such communication does not subject Wal-Mart to liability for defamation.

211 W. Va. at 720, 568 S.E.2d at 27.

---

[11] In addition to a bad motive, the Court in *Crump* noted four instances in which a qualified privilege may be defeated: 1) an intentional publication of false defamatory material; 2) a publication of false defamatory material in reckless disregard for its truth or falsity; 3) a publication of false defamatory material made to persons who have no reason to receive the information; and 4) a publication of false defamatory material with a primary purpose unrelated to the purpose of the privilege. 173 W. Va. at 707, 320 S.E.2d at 78.

16

As in *Belcher*, Ms. Langman asserts that her statements were entitled to qualified privilege because they were made in good faith about a subject in which she had an interest (her safety), and they were limited to the person who had a legitimate interest in the subject, Trooper Varner. We agree with Ms. Langman that her statements to Trooper Varner are *potentially* entitled to qualified privilege. However, we find that the circuit court erred by granting the motion to dismiss on the defamation claim regarding Ms. Langman's statements to Trooper Varner.

Mr. Zsigray's complaint alleged that Ms. Langman "slandered and libeled the Plaintiff by intentionally and *maliciously making false and misleading statements* both orally and in writing in the public domain . . . with the intent to damage . . . the Plaintiff" (Emphasis added.) For purposes of Ms. Langman's motion to dismiss, the circuit court was required to construe the complaint "in the light most favorable to plaintiff, and its allegations are to be taken as true." *Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 161 W. Va. 603, 605, 245 S.E.2d 157, 158 (1978). Because Mr. Zsigray's complaint alleged that Ms. Langman had a bad motive ("maliciously making false and misleading statements") when making her statements to Trooper Varner, his complaint included sufficient allegations to withstand a motion to dismiss on this portion of the defamation claim. We therefore reverse the circuit court's order granting Ms. Langman's motion to dismiss the defamation claim regarding the statements she made to Trooper Varner during his investigation. We remand

17

this matter to the circuit court for further proceedings on this aspect of the defamation claim.[12]

## B. Outrage/Intentional Infliction of Emotional Distress Claims

Mr. Zsigray's final assignment of error is that the circuit court erred by granting Ms. Langman's motion for summary judgment on the outrage and intentional infliction of emotional distress claims. After review, we find no error with the circuit court's ruling.

The circuit court correctly treated Mr. Zsigray's allegations of outrage and intentional infliction of emotional distress as a single claim.[13] This Court set forth the

---

[12] Because discovery has already taken place, we leave it to the circuit court to determine whether additional discovery on this specific issue is necessary on remand. To be clear, our ruling that the circuit court erred by granting the motion to dismiss on this aspect of the defamation claim does not preclude Ms. Langman from seeking summary judgment on this issue. We note that the Court in *Belcher* found that the employee's report to the police was entitled to qualified privilege after discovery occurred and after Wal-Mart filed a motion for summary judgment. If a summary judgment motion is filed, the circuit court will need to determine whether there is any evidentiary support for Mr. Zsigray's allegation that Ms. Langman had a bad motive when giving her statements to Trooper Varner. If the circuit court concludes that there is no evidentiary support for this allegation, Ms. Langman would be entitled to qualified immunity, and summary judgment would be appropriate.

[13] *See Beasley v. Mayflower Vehicle Sys., Inc.*, No. 13-0978, 2014 WL 2681689 (W.Va. June 13, 2014) (Memorandum Decision) (Intentional infliction of emotional distress is also known as the tort of outrage); *Whitehair v. Highland Memory Gardens, Inc.*, 174 W.Va. 458, 460, 327 S.E.2d 438, 440 (1985) (The intentional infliction of emotional distress is sometimes known as the tort of outrage). *See also*, Syl. Pt. 6, in part, *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 289 S.E.2d 692 (1982) ("One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress[.]").

required showing a plaintiff must make to prevail on a claim of intentional infliction of emotional distress in syllabus point three of *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998):

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

The Court in *Travis* addressed a circuit court's initial role when assessing a defendant's conduct in an intentional infliction of emotional distress claim:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

Syl. Pt. 4.

This Court has provided that the conduct giving rise to an action for intentional infliction of emotional distress has been described as being

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to

19

an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Tanner v. Rite Aid of W. Va., Inc*., 194 W. Va. 643, 651, 461 S.E.2d 149, 157 (1995) (*quoting* Restatement (Second) of Torts § 46(1) Comment (d) (1965)).

> Guided by the foregoing, the circuit court in the instant case concluded that:

> Defendant Langman's conduct cannot reasonably be considered so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Defendant Langman was working in a public place, and she had just encountered the plaintiff for a second time, wherein the plaintiff, by his own admission, for a second time used inappropriate and aggressive language towards her. It does not exceed the bounds of decency or offend community notions of acceptable conduct for an individual working in a restaurant to report an incident with a customer to law enforcement. Seeking the assistance of law enforcement and the criminal justice system is not extreme and outrageous conduct as a matter of law.

We agree with the circuit court's analysis and conclusion. Mr. Zsigray admitted that on two occasions, he complained about his order at McDonalds, was promptly given a refund, and then directed vulgar language at Ms. Langman. Further, Mr. Zsigray admitted that Ms. Langman never directed any vulgar language toward him. Instead, after the second time Mr. Zsigray directed vulgar language at her, Ms. Langman reported the incident to the police, an investigation occurred, and Trooper Varner determined that Mr. Zsigray should be charged with criminal harassment.

We find that Mr. Zsigray's allegations fall far short of the required showing a plaintiff must make to demonstrate that a defendant's conduct may reasonably be

20

regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. We therefore affirm the circuit court's order granting Ms. Langman's summary judgment motion on the outrage and intentional infliction of emotional distress claims.

## IV. CONCLUSION

We affirm the circuit court's April 20, 2018, order granting summary judgment on the outrage and intentional infliction of emotional distress claims. We affirm, in part, and reverse, in part, the circuit court's April 17, 2017, order granting Ms. Langman's motion to dismiss the defamation claim. We remand this matter to the circuit court for further proceedings consistent with this Opinion.

Affirmed, in part, reversed, in part, and remanded with directions.